IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIN M. HENDRIX, | ) | CASE NO. 1:14-cv-01296 |
| | ) | |
| Petitioner, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| JEFF LISATH, Warden, | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

On June 16, 2014, *pro se* Petitioner Erin M. Hendrix ("Petitioner" or "Hendrix") filed a Petition for Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition").  Doc. 1.  Hendrix challenges the constitutionality of her conviction and sentence in *State of Ohio v. Erin Hendrix*, Case No. 10CR000588 (Lake County).  A jury found Hendrix guilty of felonious assault, endangering children and complicity in connection with the lead poisoning of her daughter.  Doc 10-2, pp. 164-165.  The trial court sentenced Hendrix to a term of life imprisonment with parole eligibility after serving fifteen years in prison.  Doc. 10-2, p. 169.  On August 20, 2014, Respondent filed a Motion to Dismiss, arguing that Hendrix's grounds for relief are not cognizable in federal habeas and/or are procedurally defaulted.  Doc. 10.  On October 24, 2014, Hendrix filed a Memorandum in Opposition to Respondent's Motion to Dismiss.  Doc. 12.

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that Respondent's Motion to Dismiss (Doc. 10) be **GRANTED** and Hendrix's Petition (Doc. 1) be **DISMISSED with prejudice**.

# I.    Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct.  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008) *cert. denied,* 129 S. Ct. 2878 (2009). The Eleventh District Court of Appeals summarized the facts underlying Hendrix's conviction as follows:

> {¶ 2} H.H., appellant's daughter and the victim in this case, was born on September 24, 2007. At the time of H.H.'s birth, the Hendrix family lived in Bellaire, Belmont County, Ohio, where appellant was employed as a chemistry, physics, and natural sciences teacher at Bellaire High School and Rick was a pastor at a local church.

> {¶ 3} Several months after her birth, in November of 2007, H.H. was taken to Pittsburgh Children's Hospital where the family met with pediatrician Dr. Benjamin Bolser. According to the doctor, the Hendrixes had concerns regarding H.H.'s failure to gain weight, issues with her hearing, problems with vomiting, and general failure to thrive. After testing, heath care professionals also discovered H.H. had critically low calcium and blood sugar levels.

> {¶ 4} In early 2008, H.H. was diagnosed with CHARGE Syndrome, a congenital disorder that slows physical and mental development. The physical manifestations of CHARGE Syndrome can include clefts in the irises of the eyes; heart defects; blockages of the nasal passages; retardation of growth and development; non-specific genital and urinary problems; and hearing abnormalities.

> {¶ 5} On February 28, 2008, appellant brought H.H. in to visit Dr. Bolser due to concerns she had regarding, what she believed were odd movements of H.H.'s head and potential seizures. The doctor observed some abnormal movement in H.H. but considered the child to be otherwise stable. Dr. Bolser nevertheless scheduled an EEG for H.H. on the following day. On the morning of February 29, 2008, however, Dr. Bolser encountered appellant and H.H. outside his office. The doctor noticed that the child was notably fussy and pale. Instead of proceeding with the EEG, he told appellant to take H.H. to the emergency room.

> {¶ 6} H.H. went to the emergency room where she was lethargic, had an ashen-blue appearance, and was suffering from profound diarrhea. She was later transferred to the ICU where medical staff inserted a tracheostomy tube to clear

2

the child's airways as well as a gastrostomy tube for feeding. H.H. was also diagnosed with a blood disorder called methemoglobinemia, which, according to Dr. Bolser, caused her bluish appearance. And, upon reviewing H.H.'s X-rays, medical staff observed a "retained contrast material in [H.H's] GI tract." Such a phenomenon usually occurs when a patient consumes barium to highlight an area of the abdomen. According to Dr. Bolser, however, H.H. had not been administered any recent contrast material.

{¶ 7} Given her persisting symptoms, H.H.'s blood lead levels were tested on March 8, 2008. The test results yielded a dangerously high reading of 135 micrograms per deciliter ("M/D") of blood. According to Dr. Bolser, any reading above ten in a one-year-old child is cause for medical concern; H.H. was five months old at the time of the reading.

{¶ 8} Tests ultimately revealed that the opaque contrast material observed in H.H.'s X-ray was actually a collection of lead flecks that had accumulated in the child's stomach. Doctors were unable to determine specifically how or when the lead was introduced into H.H's body; given the child's age, however, it was clear that the poisonous metal was introduced to her system by another.

{¶ 9} H.H. remained in the hospital until March 26, 2008. During her stay, she was given intravenous EDTA chelation therapy. Chelators, such as EDTA, are medications used in lead and other heavy metal poisoning cases. Chelators bind to the lead in the blood and permit the body to release the poison via urination. After approximately two weeks of treatment, H.H.'s blood lead level reduced dramatically to 36 M/D. H.H. was ultimately sent home with her parents to continue oral chelation therapy using a chelator called Suximer.

{¶ 10} Medical toxicologist Dr. Anthony Pizon treated H.H. from March of 2008, after her initial test revealed the dangerously high blood lead level, through June of 2009. According to Dr. Pizon, lead poisoning commonly occurs in two specific populations, adults who work with or around the poison and toddlers who accidently poison themselves by consuming the substance, e.g., eating lead paint chips. Because H.H. did not fit either profile, the source of her exposure, while exogenous (from an outside source) remained a mystery. To rule out general environmental contamination, both appellant and H.H.'s father were tested for exposure. Their lead levels were zero. Water sources were tested as well as the family home. All tests were negative.

{¶ 11} Dr. Pizon then requested a sample of H.H.'s powdered formula to test it for the presence of lead. Appellant brought a can of the formula to the hospital in March of 2008, but when the doctor sought to retrieve it, it had disappeared and was never recovered. Dr. Pizon then asked if appellant had H.H.'s liquid medications available for testing. According to the doctor, appellant became anxious and her face went red at the suggestion. Stuttering, she admitted she had

the medications and gave them to the doctor. Two of the three medications, Pepcid and Robinul, tested positive for lead; the third, a calcium supplement, did not.

{¶ 12} With respect to the poisoned medications, Dr. Pizon ruled out accidental contamination because they came from separate pharmacies and there had been no reports of other patients suffering from lead poisoning as a result of being treated with either Pepcid or Robinul. Moreover, Dr. Pizon concluded that the amount of lead found in the medications was insufficient to trigger H.H.'s heightened 135 M/D lead reading and therefore contamination had to come from an additional exogenous source or sources.

{¶ 13} After her release in late March of 2008, H.H. returned to the hospital on April 8, 2008 for tests of her blood lead level. H.H.'s test returned a reading of 58 M/D. Although the level had increased from the previous low of 36 M/D, the elevated reading was not a surprise given the nature of a lead poisoning case. Once an individual is exposed, lead remains in the body's tissues and bones. Hence, after the blood is "cleaned" and the poison voided with the assistance of chelation therapy, lead from the bones and tissues invariably leaches back into the blood stream. In any given case, therefore, within three weeks of chelation treatment, a patient will experience a "rebound" in his or her blood lead levels. Given these points, the 58 M/D blood lead level reading represented an expected rebound that was medically consistent with a lead poisoning case.

{¶ 14} Nevertheless, Dr. Pizon noted that the chelation therapy seemed to be acting inconsistently. When H.H. was given IV chelation with EDTA, her blood lead levels fell sharply; when she was sent home with oral Suximer, however, her blood lead levels would, in Dr. Pizon's words, "skyrocket." For example, H.H.'s blood lead levels went from 58 M/D on April 8, 2008, her initial "rebound," to 97.4 M/D on May 6, 2008. While her levels decreased to 60 M/D on June 7, 2008, they rose again to 71 M/D on June 23, 2008. And, between late July and early August of 2008, her blood level readings rose from 74.7 M/D to 84 M/D. By October 3, 2008, the levels decreased to 72 M/D. Dr. Pizon remained confounded by the persistent fluctuations. The inconsistencies and relatively rapid spikes, according to Dr. Pizon, "pharmacologically, medically, just made no sense."

{¶ 15} Dr. Pizon was aware that some chelators may bind lead to tissue and increase absorption of the poison rather than cause it to be released in the urine. In order to be certain the oral Suximer was not triggering such a response, in December of 2008, Dr. Pizon placed H.H. on oral Suximer chelation in the hospital. When nurses administered the treatment, Dr. Pizon observed the levels went down nicely. According to the doctor, such a result was odd, "not because it's not what we expect, but it was strange because it's not what was typically happening with [H.H] over the previous treatments."

4

{¶ 16} While it was clear to Dr. Pizon H.H. had been poisoned by an exogenous source, it was still unclear, in his mind, the specific means by which she was poisoned. Taking all the data into consideration, the doctor concluded that the initial poisoning could not be responsible for the repeated spikes in her blood level. Similarly, Dr. Pizon did not believe the lead flecks found in H.H.'s stomach could explain the erratic spikes in the child's blood lead levels. The doctor underscored, lead in an individual's body, unless it is reintroduced, leaches *slowly,* not aggressively into the blood. And, even though the re-exposure could still occur in an accidental fashion, the doctor, and other hospital personnel, became more and more concerned that H.H. was suffering from an ongoing malicious poisoning.

{¶ 17} In late June of 2009, the Hendrix family moved from Belmont County, Ohio to Lake County, Ohio because Rick Hendrix was transferred to the Mentor United Methodist Church. The family moved into the parsonage, which, it bears noting, tested negative for lead.

{¶ 18} On July 7, 2009, appellant took H.H. to visit her new pediatrician, Dr. Susan Dykeman. Aware of H.H.'s history, the doctor decided to test the child's blood lead levels, the results of which were 51.2 M/D. Dr. Dykeman considered this reading high and referred the child to pediatric toxicologist Dr. Lawrence Quang at Rainbow Babies and Children's Hospital in Cleveland.

{¶ 19} On July 13, 2009, Dr. Quang met with appellant and H .H. He considered the child's lead level high and her medical history rather suspicious. Like Dr. Pizon, Dr. Quang emphasized that an ordinary case of child lead poisoning occurs between the ages of nine months and four years; when children have the gross motor skills to move about and the fine motor skills to pick up and place things into their mouths. As H.H. was never developmentally advanced enough to move or independently put anything in her mouth, she was not within the typical population of children who suffer from accidental lead poisoning. Furthermore, H.H.'s lead levels regularly went beyond what Dr. Quang opined was the initial rebound level after chelation was administered. Dr. Quang consequently observed that, unless poison was reintroduced, her case defied the more than seven decades of medical research in this area.

{¶ 20} Given these points, Dr. Quang initiated another blood lead level test which returned a blood lead level of 67.8 M/D, over 16 points higher than the test results received only a week earlier. Dr. Quang admitted H.H. to the hospital and, because the hospital did not have IV EDTA available, he sought permission from appellant to treat the child with Suximer chelation. Appellant refused permission, asserting Suximer had been previously used but was ineffective. The doctor offered a third option, a more toxic chelator called D-penicillamine. According to Dr. Quang, H.H. stood a 30 percent chance of an adverse reaction being treated with D-penicillamine, as opposed to a two to three percent chance using Suximer. Because, however, appellant was entitled to refuse treatment, the doctor was

obligated to respect the decision. Fortunately, Dpenicillamine worked and, by late July of 2009, H.H.'s blood lead level decreased into the mid–40s, where it remained for the next several months.

{¶ 21} On July 24, 2009, after considering H.H.'s case and speaking with his medical team, Dr. Quang, concluded appellant was involved in the introduction of lead into the child's system. He therefore contacted the department of job and family services and, given the circumstances of the case, the Mentor Police Department was notified. The department immediately launched an investigation. And, after speaking with social workers from the Lake County Department of Job and Family Services, officers obtained a search warrant for the Hendrix's home.

{¶ 22} On July 25, 2009, Mentor Police executed the warrant and, while searching a first floor spare bedroom, officers found a back pack in a closet. Inside the backpack was a double-bagged sandwich baggie containing white powder. Appellant acknowledged that she used the backpack for teaching; she denied, however, any knowledge of the contents of the baggie. When she reached for the baggie, the on-scene detective handling the evidence moved it from her reach. According to Detective Colleen Petro of the Mentor Police Department, appellant's cheeks flushed bright red and her eyes welled with tears. After being tested, the powder in the baggie was identified as lead nitrate, a colorless, near-tasteless, water soluble form of lead. On July 27, 2009, emergency custody of H.H. was granted to the Lake County Department of Job and Family Services.

{¶ 23} During the investigation, officers were able to confiscate two bottles of lead nitrate from the school where appellant formerly worked in Belmont County, a newer bottle and an older bottle. The bottles and the lead found in the baggie were sent to the Center for Disease Control for lead isotope ratio comparisons. After analysis, the samples could neither be identified nor excluded as the sources of lead in H.H.'s body. Although these tests were inconclusive, former Bellaire High School Principal Mike Sherwood was able to confirm that appellant submitted a requisition form for lead nitrate on August 1, 2007 that was filled in September of 2007; and, on October 14, 2008, she submitted a second requisition form for lead nitrate that was filled on December 31, 2008. As only one newer bottle of lead nitrate was recovered from the school, the other recently purchased bottle was unaccounted for and never recovered.

{¶ 24} Meanwhile, Dr. Quang was still concerned about the lead flecks resting in H.H.'s stomach mucosa. He considered surgery, but after consulting with pediatric surgeons, he concluded the risks of irreversible internal damage were too great. After further investigation, Dr. Quang found research indicating that a class of drugs called biophosphonates, generally used to combat the effects of osteoporosis in menopausal women, had a tendency to remove lead in the human body which is released into the bloodstream as bones age and breakdown. Although biophosphonates are not FDA approved for children, the doctor thought

he could carefully monitor the effects of the medication on H.H. and, if they work, avoid the surgical option. After receiving approval from the pediatric clinical research review committee at the hospital, H.H. was placed on a biophosphonate called Pamidronate. During her treatment, H.H.'s blood lead level dropped from 45 M/D to 35 M/D then, finally to 25 M/D where it remained in equilibrium.

{¶ 25} Not only was the Pamidronate therapy effective in further stabilizing H.H.'s blood lead level, it allowed Dr. Quang to conclude that the main contributor of her endogenous (internal) exposure was lead being released from the bone. From this, the doctor further posited that the lead flecks found in H.H.'s stomach were of negligible significance, essentially negating the need for surgery. That is, to the extent Pamidromate specifically addressed lead levels released from the bone and H.H.'s blood lead levels precipitously decreased on the medication, the extant lead flecks in her stomach contributed, at most, slightly to the profound lead intoxication from which H.H. had been suffering.

{¶ 26} After thoroughly reviewing H.H.'s medical charts and the data from H.H.'s treatment history, Dr. Quang opined that lead was exogenously reintroduced into H.H.'s system on nine different occasions between February of 2008 and July of 2009. Dr. Pizon concluded H.H. was re-poisoned on ten separate occasions. And, in hindsight, Dr. Pizon noted that H.H.'s symptoms upon admission to the hospital in February of 2008 were consistent with acute lead nitrate poisoning. Chemically, lead nitrate poisoning causes, inter alia, lethargy and explosive diarrhea, and, perhaps most significantly, the nitrate component of the lead salt causes methemoglobinemia, resulting in a cyanotic or bluish appearance.

{¶ 27} Both toxicologists agreed that had H.H. not been treated aggressively after her lead levels tested at 135 M/D, she would have died. And, according to Dr. Quang, any lead exposure to a child in the first two years of life will cause permanent, irreversible damage to the brain. Such exposure impairs the movement and reception of neurotransmitters, chemicals that, in essence, facilitate brain function. Dr. Quang also pointed out that lead poisoning in a child causes cellular apoptosis, a condition describing cell death. Exposure, therefore, impairs a child's ability to learn, causes significant behavioral difficulties, and, in fact, causes sub-normal intelligence. In H.H.'s case, Dr. Quang opined, the initial exposure caused the child to lose between 27 and 40.5 IQ points.

{¶ 28} Dr. Quang further noted that lead exposure is deleterious to kidney function, causing kidney disease, hypertension and, predisposes an individual to strokes and heart attacks later in life. Finally, the doctor pointed out lead in the bone has a half life of 20 to 30 years and thus, while it can be managed, will continue to leach into the blood stream over the course of a patient's lifetime. These points, according to Dr. Quang, will undermine H.H.'s ability to reach her full potential, particularly if her full potential was already compromised by

potentially severe pre-existing developmental delays due to the CHARGE Syndrome diagnosis.

*State v. Hendrix*, 2012 WL 2369411, *1-6 (Ohio App. 11 Dist., June 25, 2012); Doc. 10-3, pp. 62-107.

## II.  Procedural Background

**A.  State Conviction**

### 1.  Indictment and Plea

In September 29, 2010, the Lake County Grand Jury indicted Hendrix on twenty-two counts.  Doc. 10-2, pp. 1-11.  Hendrix was indicted on six counts of contaminating a substance for human consumption of use (Counts One – Six); one count of attempted aggravated murder (Count Seven); one count of attempted murder (Count Eight); one count of felonious assault (Count Nine); two counts of endangering children (Counts Ten and Eleven); two counts of complicity to attempted murder (Counts Twelve and Thirteen); one count of complicity to felonious assault (Count Fourteen); two counts of complicity to endangering children (Counts Fifteen and Sixteen); and six counts of complicity to contaminating a substance for human consumption or use (Counts Seventeen – Twenty-two).  Doc. 10-2, pp. 1-11.

On September 30, 2010, Hendrix, represented by counsel, entered a plea of not guilty to the charges in the indictment.  Doc. 10-2, pp. 12-13.   On November 17, 2010, the State filed a Motion for Leave to Amend the Indictment as to Counts One – Six (Doc. 10-2, pp. 14-25) to include "an allegation that the alleged mingling of a poison, hazardous chemical, or harmful substance was committed 'when Erin Hendrix knew or had reason to know, that the food, drink, non-prescription drug, prescription drug, or pharmaceutical product may be ingested or used by another person.'" (Doc. 10-2, pp. 131-132).  On November 24, 2010, the trial court granted the

State's Motion to Amend the Indictment.  Doc. 10-2, pp. 26-29.  Thereafter, on December 3, 2010, Hendrix filed a response to the State's Motion to Amend the Indictment, arguing that she required a copy of the Grand Jury testimony to insure that the grand jurors were aware of the applicable law regarding O.R.C. § 2927.24 and considered evidence regarding the elements that the state wanted added to the indictment.  Doc. 10-2, pp. 132.  Following a January 26, 2011, oral hearing on pending motions, on February 2, 2011, the trial court let stand its prior ruling granting the State's November 17, 2010, Motion to Amend.  Doc. 10-2, pp. 132.

### 2.  Pre-trial motions

*Motions to Suppress*

On December 17, 2010, Hendrix filed a Motion to Suppress evidence found during the July 25, 2009, search of her residence and during a subsequent search of computer related equipment that took place on or about August 7, 2009.  Doc. 10-2, pp. 30-63.  On January 6, 2011, the State filed its response to Hendrix's Motion to Suppress.  Doc. 10-2, pp. 64-68.  On January 7, 2011, Hendrix filed a Supplemental Motion to Suppress Statements Made During Search of Home.  Doc. 10-2, pp. 69-72.  On January 20, 2011, the State filed its response to Hendrix's Supplemental Motion to Suppress.  Doc. 10-2, pp. 73-79.  A hearing was conducted regarding Hendrix's motions to suppress on January 27, 2011, (Doc. 10-2, p. 80), and on January 28, 2011, the trial court denied Hendrix's motions to suppress (Doc. 10-2, pp. 80-87).

*Motion for Access to Grand Jury Records, Renewed Motion for Bill of Particulars, and Motion to Dismiss Indictment*

On December 17, 2010, Hendrix filed a Motion for Access to Grand Jury Records, Renewed Motion for Bill of Particulars, or, Alternatively, Motion to Dismiss Indictment.[1]  Doc. 10-2, pp. 88-105.  On January 3, 2011, the State filed its response.  Doc. 10-2, pp. 106-110.

---

[1] In her December 17, 2010, motion, Hendrix alternatively sought dismissal of the indictment and sought leave to file further motions after the grand jury record and bill of particulars were provided.  Doc. 10-2, pp. 103-104.

Following a January 26, 2011, oral hearing on pending motions, on February 2, 2011, the trial court denied Hendrix's request for access to grand jury records which was premised on perceived flaws in the State's indictment.  Doc. 10-2, pp. 133-135.  The trial court found Hendrix's renewed request for a bill of particulars well-taken based on the State's agreement to provide a bill and Hendrix's acknowledgement of having received it before the January 26, 2011, hearing. Doc. 10-2, p. 133.

### Motions in Limine and Motions regarding taking testimony

On January 7, 2011, Hendrix filed four motions in limine: (1) a motion in limine to exclude testimony regarding mental health issues; (2) a motion in limine to exclude evidence of falsification of college transcript; (3) a motion in limine to exclude evidence of lead nitrate; and (4) a motion in limine to exclude testimony of past sexual abuse.  Doc. 10-2, pp. 111-116, 117-121, 122-125, 126-130, 131.  The State filed two evidentiary motions: (1) January 25, 2011, motion for taking a video deposition; and (2) January 26, 2011, oral motion to take testimony of David Green out of order.  Doc. 10-2, p. 131.

Following the January 26, 2011, oral hearing, on February 2, 2011, the trial court granted Hendrix's motion in limine to exclude testimony regarding mental health issues and also granted the State's motion for taking video deposition and motion to take testimony of David Green out of order.  Doc. 10-2, p. 131.  The trial court held in abeyance, pending an evidentiary hearing at trial, Hendrix's motions in limine to exclude evidence of falsification of college transcript and to exclude evidence of past sexual abuse.  Doc. 10-2, p. 132.  The trial court made no ruling regarding Hendrix's motion in limine to exclude evidence of lead nitrate noting that that motion related to motions to compel testimony from scientists located at the Center for Disease Control

and Prevention in Georgia which had not been filed as of the time of the hearing.  Doc. 10-2, pp. 132-133.

### 3.  Trial and sentencing

Following a jury trial, on February 28, 2011, the jury found Hendrix guilty of felonious assault (Count Nine), both counts of endangering children (Counts Ten and Eleven), and eleven counts of complicity (Counts Twelve – Twenty-Two).  Doc. 10-2, pp. 164-165.   The jury found Hendrix not guilty of the first eight counts.  Doc. 10-2, pp. 165-166.

On March 15, 2011, the trial court conducted a sentencing hearing and, on March 21, 2011, issued its Judgment Entry of Sentence.  Doc. 10-2, pp. 167-171.  The trial court merged Counts Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Nineteen, Twenty, Twenty-One, and Twenty-Two with Count Eighteen (complicity to contaminating a substance for human consumption or use) for purposes of sentencing and sentenced Hendrix to a term of life imprisonment with parole eligibility after serving fifteen years in prison.  Doc. 10-2, p. 169.

### B.    Direct appeal

On April 11, 2011, Hendrix, represented by counsel, filed a Notice of Appeal with the Eleventh District Court of Appeals.  Doc. 10-2, pp. 172-178.  On October 24, 2011, Hendrix filed her appellate brief asserting the following assignments of error:

1. The trial court erred to the prejudice of the defendant-appellant when it overruled her motion to dismiss the defective indictment in violation of her right to indictment under the Ohio Constitution and Due Process under the United States and Ohio Constitutions.

   First Issue Presented for Review and Argument: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where its counts were duplicitous.

<u>Second Issue Presented for Review and Argument</u>: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where it contained overlapping, "carbon-copy" counts.

<u>Third Issue Presented for Review and Argument</u>: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where its counts were multiplicitous.

<u>Fourth Issue Presented for Review and Argument</u>: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where its counts lacked essential elements of the crimes charged and misstated the requisite mens rea.

2. The trial court erred to the prejudice of the defendant-appellant when it overruled her motion to dismiss the charges of attempted felony-murder and complicity to attempted felony-murder in violation of her right to Due Process as guaranteed by the United States and Ohio Constitutions.

   <u>Issue Presented for Review and Argument</u>: The counts in the indictment alleging attempted felony murder and complicity to attempted felony murder failed to state an offense and should have been dismissed.

3. The defendant-appellant's constitutional rights to indictment, trial in the county where the offense is alleged to have been committed and due process were violated when the trial court gave an inappropriate venue instruction over defense objection in contravention of the Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

   <u>Issue Presented for Review and Argument</u>: When the defendant-appellant was indicted as having committed a course of criminal conduct with at least one of the offenses or any element of one of the offenses occurring in Lake County, the trial court erred when it gave a venue instruction per R.C. 2901.12(G) that told the jury the defendant-appellant could be tried in Lake County even if the jury could not determine that she had committed an offense or element of an offense in Lake County.

4. The trial court erred when it denied the defendant-appellant's request for a verdict form addressing venue in violation of her rights to due process and fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United State[s] Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Issue Presented for Review and Argument: The trial court committed reversible error when it rejected the defendant-appellant's Proposed Additional Verdict Form which asked the jury to specify, for each guilty verdict, what elements, if any, it found she had committed in Lake County.

5.  The defendant-appellant was deprived of her constitutional rights to fair trial and due process when the trial court admitted irrelevant and misleading testimony regarding an alleged prior bad act and her character as a high school chemistry teacher.

Issue Presented for Review and Argument: The trial court committed reversible error when it permitted the State to elicit irrelevant and misleading testimony regarding the defendant-appellant's alleged unsafe behavior regarding a mercury spill in her high school classroom.

6.  The trial court erred to the prejudice of the defendant-appellant when it denied her motion for acquittal made pursuant to Crim. R. 29(A).

Issue Presented for Review and Argument: The trial court erred in denying the defendant-appellant's Crim. R. 29 Motion for Acquittal where the State failed to provide sufficient evidence to establish beyond a reasonable doubt that any of the offenses or any element of the offenses occurred in Lake county, that the defendant-appellant was either the principle [sic] offender or complicit in the offenses and/or that the poison in the medication involved in specific counts caused serious physical harm or was sufficient to cause death.

7.  The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.

Issue Presented for Review and Argument: The conviction of the defendant-appellant is not supported by competent, credible evidence which proves her guilt beyond a reasonable doubt.

Doc. 10-2, pp. 179-230. The State filed its appellate brief on January 4, 2012. Doc. 10-3, pp. 1-53. On June 25, 2012, the Eleventh District Court of Appeals affirmed the judgment of the trial court. Doc. 10-3, pp. 62-107; *see also State v. Hendrix*, 2012 WL 2369411 (Ohio App. 11 Dist., June 25, 2012). Hendrix did not appeal the decision to the Ohio Supreme Court.

**C.  Petition to Vacate and Set Aside Judgment**

While her appeal to the Eleventh District Court of Appeals was pending, on January 13, 2012, Hendrix, represented by counsel, filed a Petition to Vacate and Set Aside Judgment under

R.C. 2953.21.  Doc. 10-3, pp. 108-216.  In her Petition to Vacate and Set Aside Judgment,

Hendrix asserted eight grounds for relief which are summarized below:

<u>Ground One</u>: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments.  Mrs. Hendrix's counsel failed to employ an expert to review the CDC's report.

<u>Ground Two:</u> Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments.  Mrs. Hendrix's counsel failed to employ a competent expert to refute Dr. Quang's testimony that the CDC's report scientifically concluded that H.H. was poisoned by more than one lead product, and that the poisoning was accomplished with a mixture of the three lead samples that were seized from Ms. Hendrix's classroom and possession.

<u>Ground Three</u>: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments.  Mrs. Hendrix's counsel failed to request a continuance in order to consult with a competent expert after hearing Dr. Quang's testimony that the CDC's report scientifically concluded that H.H. was poisoned by more than one lead product, and that the poisoning was accomplished with a mixture of the three lead samples that were seized from Ms. Hendrix's classroom and possession.

<u>Ground Four</u>: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments. Mrs. Hendrix's counsel failed to object to the three lead-nitrate samples as being more prejudicial than probative, and that the samples should have been excluded.

<u>Ground Five</u>: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments.  Mrs. Hendrix's counsel failed to object to Dr. Quang's interpretations regarding the CDC's report.  Because Dr. Quang did not conduct the analysis, and the CDC analysts were only testifying as fact witnesses, Dr. Quang's testimony regarding his conclusions as to the CDC's report violated Erin Hendrix's rights under the Confrontation Clause of the United States Constitution.

<u>Ground Six</u>: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied due process when the State failed to comply with Crim. R. 16(K) regarding Dr. Quang's testimony relating to his erroneous interpretation of the CDC's report.

Ground Seven: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments.  Mrs. Hendrix's counsel failed to object when Dr. Quang began to testify outside the realm of both his expertise and the discovery report.

Ground Eight: The State's misconduct for exceeding the boundaries as set forth in Evid. R. 702 denied Mrs. Hendrix the right to a fair trial and due process of law.

Doc. 10-3, pp. 125-145.  On March 16, 2012, the State filed its Response to Hendrix's Petition to Vacate and Set Aside Judgment.  Doc. 1-4, pp. 1-105.  Hendrix filed a Reply.  Doc. 10-4, pp. 111-121.  On June 29, 2012, the trial court denied Hendrix's Petition to Vacate and Set Aside Judgment without an oral hearing.  Doc. 10-4, pp. 122-134.

Hendrix, represented by counsel, filed an appeal from the trial court's June 29, 2012, order denying her Petition to Vacate and Set Aside Judgment.  Doc. 10-4, pp. 135-215.  In her brief, she raised the following assignment of error:

The trial court erred in dismissing Mrs. Hendrix's petition without an evidentiary hearing because Mrs. Hendrix provided sufficient evidence that she was denied the effective assistance of counsel and that the State failed to conduct Mrs. Hendrix's trial in accordance with Ohio rules of evidence.

Doc. 10-4, p. 142.  In support of her assignment of error, she argued:

I.   A defendant is denied the effective assistance of counsel if counsel fails to ensure that a qualified expert, whose testimony would exonerate the defendant, is available to testify.

II.  A prosecutor's misconduct denies a defendant due process as guaranteed by the Fourteenth Amendment of the United States Constitution and Section 16, Article I of the Ohio Constitution.

III. An evidentiary hearing is warranted in postconviction proceedings when the petitioner alleges sufficient operative facts to state a claim for the ineffective assistance of counsel.

IV.  The unwarranted dismissal of a postconviction petition without a hearing is a denial of due process.

Doc. 10-4, pp. 143-154.  On September 27, 2012, the State filed its brief.  Doc. 10-4, pp. 216-247.  On February 25, 2013, the Eleventh District Court of Appeals affirmed the judgment of the trial court.  Doc. 10-4, pp. 250-261.

On April 10, 2013, Hendrix, represented by counsel, filed a Notice of Appeal from the Eleventh District Court of Appeals' February 25, 2013, judgment to the Ohio Supreme Court and a Memorandum in Support of Jurisdiction.  Doc. 10-5, pp. 248-283.  In her Memorandum in Support of Jurisdiction, Hendrix asserted four propositions of law which are summarized below:

I. A defendant is denied the effective assistance of counsel when counsel fails to consult with or present a competent, credible expert whose testimony would have had a reasonable probability of changing the outcome of the trial.

II. When the preparer of a report refuses to make a scientific conclusion based on the report, a defendant is denied the effective assistance of counsel and her right to confrontation when counsel fails to object to an unqualified "expert" who did not prepare the report yet testified to his own scientific conclusions.

III. A defendant is denied due process when the State fails to comply with Crim. R. 16(K) and provide, prior to trial, an accurate statement regarding an expert witness's testimony.

IV. In postconviction proceedings, an evidentiary hearing must be afforded to a defendant who alleges sufficient operative facts from outside of the record to state a claim for the ineffective assistance of counsel.

Doc. 10-5, pp. 259-268.  On May 7, 2013, the State filed a Memorandum in Response.  Doc. 10-5, pp. 284-299.  On June 26, 2013, the Ohio Supreme Court declined "to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4)."  Doc. 10-5, p. 300.

**D.      Application for Reopening Pursuant to App. R. 26(B)**

On September 18, 2012, Hendrix, with counsel, filed an Application to Reopen her direct appeal.  Doc. 10-5, pp. 1-226.  In her Application to Reopen, Hendrix argued that appellate counsel was ineffective in failing to raise the following issues on appeal:

1. Erin Hendrix was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments.  Mrs. Hendrix's counsel failed to object to Dr. Quang's interpretations regarding the CDC's report.  Because Dr. Quang did not conduct the analysis, and the CDC analysts were only testifying as fact witnesses, Dr. Quang's testimony regarding his conclusions as to the CDC's report violated Erin Hendrix's rights under the Confrontation Clause of the United States Constitution.

2. Erin Hendrix was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments.  Mrs. Hendrix's counsel failed to object to the State's failure to qualify Dr. Quang as an expert in organic chemistry.

Doc. 10-5, pp. 6-10.

On October 12, 2012, the State filed its Response.  Doc. 10-5, pp. 227-236.  On December 5, 2012, the Eleventh District Court of Appeals denied Hendrix's Application to Reopen her appeal concluding that appellate counsel was not ineffective for failing to raise the foregoing issues as assignments of error.  Doc. 10-5, pp. 237-247.  Hendrix did not appeal the decision to the Ohio Supreme Court.

**E.     Federal Habeas Corpus**

On June 16, 2014, Hendrix filed her Petition asserting the following five grounds for relief:

**Ground One**: Habeas corpus should be granted when appellant received ineffective counsel during trial.  Counsel did not present sufficient evidence related to the serious genetic disorder – CHARGE Syndrome – a birth defect suffered by the victim and the impact that condition had on her development.  He did not object to the testimony presented by the prosecution that the developmental delays of the child were caused by the lead poisoning, to the prejudice of the appellant.

Supporting Facts: The victim was diagnosed with CHARGE syndrome very early in her life.  She has many of the symptoms indicated in the chart.[2]  The impact of this diagnosis and the resultant issues in dealing with daily care, let alone treatment of lead poisoning, are extremely complex and present significant

---

[2] As part of Ground One, Hendrix includes information regarding CHARGE Syndrome which she states was obtained from the CHARGE Syndrome Foundation website.  Doc. 1-1, pp. 1-3.

challenges to the doctors that treat the victim. It was speculated in the course of her treatment that the development delays in the child contributed to the irregular changes in the lead readings when the child's blood was tested. The Pittsburgh Childrens Hospital felt that for all of their experience with the child and the parents (16 months) that the evidence of recurring exogenous lead poisoning was inconclusive, the original lead poisoning was unexplained and, though the blood readings were abnormal, there was insufficient evidence to remove the child from the parents care.

One week of treatment by Dr. Quang changed all of that when the family moved to Cleveland. However, during the discovery phase of the medical records during pre-trial preparation, a letter prepared by Dr. Quang indicated that he felt the treatment of the patient was "singularly unique" due to CHARGE Syndrome. In fact, in his medical records on the case, Dr. Quang indicated that he felt that the case was singularly unique because of the developmental issues and the lead poisoning taken together.

Counsel did little to bring this genetic condition into his cross examination of expert medical witnesses and did not present witnesses during the defense presentation to adequately explain CHARGE Syndrome and the implications that it presented in the treatment of the child. The jury could not be expected to understand the deleterious effect that CHARGE syndrome presented in the course of treatment of the child and no geneticists were sought as witnesses to assist the defense counsel in making these issues clear.

**Ground Two**: Habeas corpus should be granted when a defendant is denied her right to due process when unfounded characterizations of the victim are offered which result in substantial and injurious effect or influence in determining the jury's verdict.

<u>Supporting Facts</u>: The trial court erred in allowing the victim to be characterized as mentally retarded. While scientific evidence may indicate that lead poisoning could have a deleterious affect on brain function in a general sense, no cognitive testing was ever conducted for the victim. The child has a genetic disorder that results in a delay of physical development, but never was it determined by testing that she was or is cognitively impaired as a result of the lead poisoning.

In direct testimony by Dr. Quang, a toxicologist, he stated that the child is "mentally retarded" and that she suffered a decline in her IQ of as much as 75 points. A similar statement was used by the prosecution in their closing arguments. In fact, the child demonstrated mental acuity in being able to learn sign language, taught by her mother, which allowed her to effectively communicate as much as any child of two years old can communicate.

The suggestion that the victim was mentally retarded was false and unfounded since no testing was ever done. It was meant to portray the accused in the worst light and prejudiced the jury against Mrs. Hendrix.

**Ground Three**: Habeas corpus should be granted when a defendant is denied due process because the State fails to comply with the court's rules related to providing opposing counsel, prior to the trial, an accurate statement regarding matters to which a witness will testify and their expertise with respect to the testimony expected to be given.

Supporting Facts: Dr. Quang is a medical doctor and a board certified toxicologist. It was disclosed that he would testify as to the diagnosis and treatment of the victim. The defense was notified in the discovery provided by the State that he would be testifying regarding these aspects of his training and knowledge as it related to the case. At no point did the letter addressing his qualifications indicate that he was going to testify as a supplemental expert to the CDC's experts. Defense counsel had no notice that he would offer testimony to interpret the CDC report. The scientifically inaccurate testimony, together with defense counsel's failure to object, directly led to the appellant's conviction.

**Ground Four**: Habeas corpus should be granted when counsel fails to object to an unqualified "expert" who did not prepare the report in evidence, yet testified to its scientific conclusions. The preparer of the analysis did not reach a definitive conclusion that the evidence presented to the court was the same evidence that poisoned the victim.

Supporting Facts: The CDC prepared a report summarizing its testing of the evidentiary material found in the appellant's home and the two lead sources obtained from the high school where the appellant was a physics and chemistry teacher. The report on the scientific testing of the material explained that the CDC was unable to make any scientific conclusions as to the source of the lead in the victim's body and found that the lead evidence did not match the lead in the victim's blood and urine samples tested. The report stated that the lead provided by the State was clearly different for two of the items tested and very different for the third material from the lead in the blood and urine samples of the victim that were tested. The qualified witnesses – two doctors from CDC – found the testing inconclusive with respect to it being the source of the lead that poisoned the victim.

Prosecution witness, Dr. Quang, who did not conduct the analysis of the properties of the tested material, but only reviewed the CDC report, overstated his conclusions that the lead in evidence and the lead in the victim's body were the same. Counsel did not object to Quang's testimony regarding the source of the lead.

**Ground Five**: Habeas corpus should be granted when the defendant's 6th amendment rights have been violated with respect to determination of where the alleged crime occurred.

Supporting Facts: The family moved to Cleveland in June, 2009. On July 14, 2009, the victim was admitted to the Rainbow Babies & Children's Hospital in Cleveland with an elevated lead level in her blood. The toxicologist, Dr. Quang,

within nine days, checked the home for lead and treated the child, who had previously been treated at the Pittsburgh Children's Hospital for 16 months.

On July 23rd, Quang contacted Ohio Child Protective Services and arranged for emergency custody of the child.  The family home was searched two days later by police, including all of the medical waste that had accumulated since the move.  The medical waste included feeding tubes and cleaning materials and none of these items were found to have any trace elements of lead on them.

The Direct Appeal questioned the ruling of the court to a defense counsel objection that the judge's instructions to the jury were inconsistent with the indictment.  The indictment by Lake County grand jury stated that the defendant had committed a course of criminal conduct with at least one of the offenses or any element of one of the offenses occurring in Lake County.  The jury instruction included this sentence: "When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more counties or jurisdictions, but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any of those counties or jurisdictions."

Doc. 1, Doc. 1-1.

### III.     Law and Analysis

**A.     Standard of Review under AEDPA**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA.[3] *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  In particular, the controlling AEDPA provision states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3] The AEDPA statute of limitations for filing a petition for a writ of habeas corpus is one year and it begins to run on the date judgment became final. 28 U.S.C. § 2244(d)(1).  The statute of limitations has not been raised as an issue in this case.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A decision is "contrary to" clearly established federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).  A state court's adjudication only results in an "unreasonable application" of clearly established federal law when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Id*. at 599-600 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established law must be objectively unreasonable."  *Id.*

In order to obtain federal habeas corpus relief, a petitioner must establish that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Richter*, 131 S. Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652,

21

664 (2004)).  The petitioner carries the burden of proof.  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

**B.     Exhaustion and Procedural Default**

**1.  Exhaustion**

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of her claims to the state courts.  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law.  *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).  In determining whether a petitioner presented his claim in such a way as to alert the state courts to its federal nature, a federal habeas court should consider whether the petitioner: (1) relied on federal cases employing constitutional analysis; (2) relied on state cases employing constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms

sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well

within the mainstream of constitutional law.  *McMeans,* 228 F.3d at 681.

### 2.  Procedural Default

A petitioner must meet certain procedural requirements in order to have his claims

reviewed in federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir.

2006).  "Procedural barriers, such as . . . rules concerning procedural default and exhaustion of

remedies, operate to limit access to review on the merits of a constitutional claim."  *Daniels v.*

*United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused

with exhaustion, exhaustion and procedural default are distinct concepts.  *Williams v. Anderson*,

460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies where state remedies are "still

available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107,

125 n.28 (1982)).  In contrast, where state court remedies are no longer available, procedural

default rather than exhaustion applies.  *Williams*, 460 F.3d at 806.

Procedural default may occur in two ways.  *Williams*, 460 F.3d at 806.  First, a petitioner

procedurally defaults a claim if a petitioner fails "to comply with state procedural rules in

presenting his claim to the appropriate state court."  *Id.*  In *Maupin v. Smith,* 785 F.2d 135, 138

(6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining

whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a

state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim

and whether petitioner failed to comply with that rule; (2) whether the state court enforced the

procedural rule; (3) whether the state procedural rule is an adequate and independent state

ground on which the state can foreclose review of the federal constitutional claim and (4)

whether the petitioner can demonstrate cause for her failure to follow the rule and that she was

actually prejudiced by the alleged constitutional error. *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)); *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D.Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *see also State v. Moreland*, 50 Ohio St.3d 58, 62 (1990)(failure to present a claim to a state court of appeals constituted a waiver).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.  While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, see *Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review.  *Williams,* 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.  "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.* at 753.  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural

rule." *Id.*  "A fundamental miscarriage of justice results from the conviction of one who is

'actually innocent.'"  *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

## C.    Grounds for Relief

### 1.  Ground One is procedurally defaulted

In Ground One, Hendrix asserts:

> Counsel did not present sufficient evidence related to the serious genetic disorder
> – CHARGE Syndrome – a birth defect suffered by the victim and the impact that
> condition had on her development.  He did not object to the testimony presented
> by the prosecution that the developmental delays of the child were caused by the
> lead poisoning, to the prejudice of the appellant.

Doc. 1-1, p. 1.  Respondent contends that Ground One is procedurally defaulted because Hendrix

never presented the claims in Ground One to the state courts.  Doc. 10, pp. 22-23, 24-26.

Hendrix does not dispute Respondent's contention that she never presented the claims in Ground

One to the state courts.  In fact, in her Petition, she concedes that Ground One was neither

presented in her direct appeal from her conviction nor in her postconviction petition.  Doc. 1, p.

6.

Because Hendrix did not fairly present her claims in Ground One to the state courts,

Ground One is procedurally defaulted and barred from federal habeas review unless Hendrix can

overcome the procedural default.  *See Williams*, 460 F.3d at 806 ("a petitioner may procedurally

default a claim by failing to raise a claim in state court, and pursue that claim through the state's

'ordinary appellate review procedures'" (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848

(1999)); *see also  Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D.Ohio 2003) ("Issues not

presented at each and every level [of the state courts] cannot be considered in a federal habeas

corpus petition.").  To overcome the procedural bar, Hendrix must show cause for the default and

actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.

In an attempt to excuse her procedural default of Ground One, Hendrix appears to argue that her procedural default should be excused because her appellate counsel was ineffective. Doc. 12, p. 3.  She argues "I had no voice in the decisions as to the issues to be appealed [and] [t]hat should be considered an objective factor external to the defense that constitutes cause." Doc. 12, p. 3.  A claim of ineffective assistance of appellate counsel in certain circumstances may serve as cause to excuse the procedural default of the underlying substantive claim(s). *Edwards v. Carpenter*, 529 U.S. 446, 451-454 (2000).  However, in order for a petitioner's claim of ineffective assistance of appellate counsel to serve as cause to overcome a procedural default, the claim of ineffective assistance of counsel must not itself have been procedurally defaulted. *Id; see also Dixon v. Hudson*, 2008 WL 540905, * 5 (N.D. Ohio Feb. 25, 2008) (citing *Murray v. Carrier*, 477 U.S. 478, 489 (1986)).  Although Hendrix filed an App. R. 26(B) claiming ineffective assistance of appellate counsel, she did not assert that her appellate counsel was ineffective for failing to argue that trial counsel was ineffective for not raising the claims that Hendrix raises in Ground One.  *See* Doc. 10-5, pp. 6-10 (App. R. 26(B) Application).  Nor did she appeal the Eleventh District Court of Appeals' decision to the Ohio Supreme Court.  Thus, Hendrix's alleged cause to excuse the procedural default of Ground One, i.e., ineffective assistance of appellate counsel, is itself procedurally defaulted and may not serve to excuse Hendrix's procedural default of Ground One.

In arguing cause to excuse her procedural default, Hendrix also contends that there was a lack of coordination between various counsel who represented her and that she lacked personal involvement in the initial and subsequent appeal.  Doc. 12, pp. 2, 3, 4.  To the extent that

Hendrix raises these issues to support her claim that appellate counsel was ineffective, as set forth above, her claim of alleged ineffective assistance of appellate counsel was itself procedurally defaulted and therefore cannot serve as cause to excuse the procedural default of Ground One.  Additionally, Hendrix has failed to demonstrate or articulate how that lack of coordination between various counsel caused her not to raise certain issues and/or that her lack of personal involvement in her appeal is a sufficient reason to excuse her procedural default.

Since Hendrix is unable to demonstrate "cause," even if Hendrix could show "prejudice," Ground One is barred from federal habeas review based on the procedural default.

Hendrix also argues that her procedural default should be excused because, if it is not excused, there would be a miscarriage of justice.  Doc. 12, p. 3.  She contends that had the CHARGE Syndrome "condition been fairly presented, there would have been created a reasonable doubt that would have made a judgment of conviction impossible."  Doc. 12, p. 3.  Hendrix agrees that her daughter was poisoned but contends that the issues at trial were who poisoned her and how.  Doc. 12, p. 4.   She argues that, had evidence of CHARGE Syndrome been fairly presented, it would have impacted the way in which the victim's physical condition and rebound data were interpreted.  Doc. 12, pp. 2-4.

"A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  In order to overcome a procedural default through a showing of a fundamental miscarriage of justice, i.e., that a petitioner is actually innocent, a claim of actual innocence requires a showing of "new reliable evidence" and a showing that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Schulp v. Delo*, 513 U.S. 298, 324, 327 (1995).  "'Actual innocence' means factual innocence,

not mere legal insufficiency." *See Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).  Even if, notwithstanding the availability of such evidence at the time of her trial, Hendrix could demonstrate that evidence of CHARGE Syndrome was "new reliable evidence," she has failed to demonstrate that such evidence shows that she is actually innocent.  Thus, Hendrix's procedural default of Ground One may not be overcome on the basis that she is actually innocent.

Accordingly, the undersigned recommends that the Court find that Ground One is barred from federal habeas review.

### 2.  Ground Two is procedurally defaulted

In Ground Two, Hendrix asserts:

> Habeas corpus should be granted when a defendant is denied her right to due process when unfounded characterizations of the victim are offered which result in substantial and injurious effect or influence in determining the jury's verdict.

Doc. 1. Respondent contends that Ground Two is procedurally defaulted because Hendrix never presented the claims in Ground Two to the state courts.  Doc. 10, pp. 28-29.  Hendrix does not dispute Respondent's contention she never presented the claims in Ground Two to the state courts.  In fact, in her Petition, she concedes that Ground Two was neither presented in Hendrix's direct appeal from her conviction nor in her postconviction petition.  Doc. 1, p. 7.

Because Hendrix did not present her claims in Ground Two to the state courts, Ground Two, like Ground One, is procedurally defaulted and barred from federal habeas review unless Hendrix can overcome the procedural default.  *See Williams*, 460 F.3d at 806; *see also Baston*, 282 F.Supp.2d at 661.  In an attempt to overcome the procedural default of Ground Two, Hendrix focuses her argument on claimed prejudice as a result of the admission of certain evidence regarding the victim.  Doc. 12, pp. 4-5.  As for cause, Hendrix again appears to argue that her claim was not raised in the state courts because of a lack of coordination between

various counsel who represented her and that she lacked personal involvement in the initial and subsequent appeal.  Doc. 12, p. 4.  As set forth above, Hendrix's claim of ineffective assistance of appellate counsel has itself been procedurally defaulted and may not serve as cause and she has failed to demonstrate or articulate how that lack of coordination between various counsel caused her not to raise certain issues and/or that her lack of personal involvement in her appeal is a sufficient reason to excuse her procedural default.

Since Hendrix is unable to demonstrate "cause," even if Hendrix could show "prejudice," Ground Two is barred from federal habeas review based on the procedural default.[4] Accordingly, the undersigned recommends that the Court find that Ground Two is barred from federal habeas review.

### 3.  Ground Three is not cognizable

In Ground Three, Hendrix asserts:

> Habeas corpus should be granted when a defendant is denied due process because the State fails to comply with the court's rules related to providing opposing counsel, prior to the trial, an accurate statement regarding matters to which a witness will testify and their expertise with respect to the testimony expected to be given.

Doc. 1, p. 9.[5]

Respondent argues that Ground Three concerns a state law issue rather than a federal constitutional issue and state law evidentiary issues are not cognizable in federal habeas review. Doc. 10, pp. 31-36.  Here, Hendrix's arguments in her Traverse make clear that Ground Three

---

[4] As with Ground One, Hendrix has not demonstrated that her procedural default of Ground Two should be excused on the basis that she is actually innocent.

[5] Hendrix argued the issue raised in Ground Three in Ground Six of her Petition to Vacate and Set Aside Judgment (Doc. 10-3, pp. 138-140), in her appeal from the trial court's denial of her Petition to Vacate and Set Aside Judgment (Doc. 10-4, pp. 151-152) and in her Memorandum in Support of Jurisdiction filed with the Ohio Supreme Court from the State Court of Appeals' judgment affirming the trial court's denial of her Petition to Vacate and Set Aside Judgment (Doc. 10-4, pp. 266-267).  Respondent does not contend that Hendrix did not present the issue in Ground Three to the state courts for review.

asserts state law evidentiary issues.[6]  For example, in her Traverse, Hendrix states with respect to Ground Three, "What Petitioner is asking the court to consider is the scope of the testimony provided by the witness (Quang), the lack of information provided to the defense with respect to Quang being a supplemental witness to the CDC report and the prejudice that that presents under the state of Ohio's rules of evidence."  Doc. 12, p. 6.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).  Thus, "[s]tate-law evidentiary errors are not generally cognizable in habeas corpus proceedings." *Hirsch v. Brigano*, 74 Fed. Appx. 486, 489 (6th Cir. 2003).  Instead, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, law, or treaties of the United States." *Estelle*, 502 U.S. at 68.  "When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (internal citations omitted). Yet, "the category of infractions that violate 'fundamental fairness' [has been defined] very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990); *see also Bugh*, 329 F.3d at 512.  Here, Hendrix has not demonstrated that the admission of Dr. Quang's testimony deprived her of a fundamentally fair

---

[6] As part of her supporting facts for Ground Three, Hendrix states, "The scientifically inaccurate testimony, *together with defense counsel's failure to object*, directly led to the appellant's conviction."  Doc. 1, p. 8 (emphasis supplied). Thus, Respondent also argues that Hendrix procedurally defaulted Ground Three with respect to a claim of ineffective assistance of counsel because Hendrix failed to comply with a state procedural rule, i.e., *res judicata*, in raising that claim.  Doc. 10, pp. 31-40.  However, Hendrix emphasizes in her Traverse that, in Ground Three, she is not asserting a claim of ineffective assistance of trial counsel but rather is arguing that she was prejudiced as a result of the admission of evidence not properly provided during discovery.  Doc. 12, p. 6.  Hendrix's claim that her trial counsel was ineffective for failing to object to the testimony of Dr. Quang on the basis that he was unqualified and because, even though he did not prepare the CDC report, he testified to its scientific conclusions is contained in Ground Four.  Thus, Respondent's procedural default arguments relating to the claim of ineffective assistance of trial counsel regarding Dr. Quang's testimony are addressed below in Ground Four.

trial.[7]  For example, when reviewing Hendrix's assignments of error from the trial court's denial of her Petition to Vacate and Set Aside Judgment, the Ohio Court of Appeals concluded that "Trial counsel's cross-examination effectively attacked Dr. Quang's testimony regarding the implications of the CDC report . . ."  Doc. 10-4, p. 258; *see also* Ohio Court of Appeals' December 5, 2012, judgment entry (Doc. 10-5, pp. 237-247) (finding Hendrix's claims of ineffective assistance of trial counsel based on a failure to object to the testimony and qualifications of Dr. Quang to be without merit).

For the reasons set forth above, the undersigned recommends that the Court find that Ground Three is not cognizable.[8]

### 4.  Ground Four is procedurally defaulted

In Ground Four, Hendrix asserts:

Habeas corpus should be granted when counsel fails to object to an unqualified "expert" who did not prepare the report in evidence, yet testified to its scientific conclusions.   The preparer of the analysis did not reach a definitive conclusion that the evidence presented to the court was the same evidence that poisoned the victim.

Doc. 1, p. 10.[9]

---

[7] Additionally, Hendrix has not demonstrated that the admission of Dr. Quang's testimony was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States such that federal habeas relief is warranted under 28 U.S.C. § 2254.

[8] In its February 25, 2013, decision affirming the trial court's denial of Hendrix's Petition to Vacate and Set Aside Judgment, the Ohio Court of Appeals concluded that Hendrix's claims regarding the presentation of evidence that was allegedly not properly provided prior to trial was an issue that could have been determined on direct appeal and therefore was barred by *res judicata*.  Doc. 10-4, p. 259.  Thus, Hendrix also may have procedurally defaulted Ground Three for failure to adhere to a state procedural rule when presenting her evidentiary claim to the state courts.  *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court.").

[9] Hendrix argued the issue raised in Ground Four in Ground Seven of her Petition to Vacate and Set Aside Judgment (Doc. 10-3, pp. 140-142), in her appeal from the trial court's denial of her Petition to Vacate and Set Aside Judgment (Doc. 10-4, pp. 143-150) and in her Memorandum in Support of Jurisdiction filed with the Ohio Supreme Court from the State Court of Appeals' judgment affirming the trial court's denial of her Petition to Vacate and Set Aside Judgment (Doc. 10-5, pp. 263-265).  Respondent does not contend that Hendrix did not present the issue in Ground Four to the state courts for review.

Respondent contends that Hendrix procedurally defaulted her claim that her trial counsel was ineffective for not objecting to Dr. Quang's testimony regarding the CDC report.  Doc. 10, pp. 36-41; *see* FN 6 above.  Since procedural default is alleged based on a failure to comply with a state procedural rule, review under the four *Maupin* factors is required.  *See Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986) (setting forth four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule).

"Ohio's doctrine of *res judicata* . . . provides in relevant part that a final judgment of conviction bars a convicted defendant from raising in any proceeding, except an appeal from that judgment, any issue that was raised, or could have been raised, at trial or on appeal from that judgment." *Williams v. Bagley,* 380 F.3d 932, 967 (6th Cir. 2004) (citing *State v. Perry,* 10 Ohio St.2d 175 (1967)); *see also Norris v. Schotten,* 146 F.3d 314, 332 (6th Cir. 1998) ((citing *State v. Combs,* 652 N.E.2d 205, 209 (Ohio Ct. App. 1994) for its holding that *res judicata* precludes post-conviction relief to address constitutional claims that could have been raised on direct appeal from the conviction and sentence)).  Here, the Ohio Court of Appeals considered Hendrix's ineffective assistance of trial counsel claims in connection with Hendrix's appeal from the trial court's denial of her Petition to Vacate and Set Aside Judgment. Doc. 10-4, pp. 250-261. In affirming the trial court's denial of Hendrix's Petition to Vacate and Set Aside Judgment, the Ohio Court of Appeals reached the conclusion that Hendrix's assignments of error, including her ineffective assistance of counsel claims, could have been raised in her direct appeal without use of evidence dehors the record and therefore she was barred by *res judicata* from litigating the issues through a petition for postconviction relief.[10]  Doc. 10-4, pp. 250-261.  Thus, under the

---

[10] Hendrix appealed the Ohio Court of Appeals' judgment and the Ohio Supreme Court declined to accept jurisdiction.  Doc. 10-5, p. 300.

first two *Maupin* prongs, Hendrix failed to comply with a state procedural rule with respect to the claims asserted in Ground Four and the state court enforced that rule.  With respect to the third *Maupin* prong, i.e., whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim, *res judicata* is an adequate and independent state ground for precluding federal habeas review.  *Williams*, 380 F.3d at 967-968.

Accordingly, the foregoing demonstrates that, under the first three *Maupin* prongs, *res judicata* is a state procedural rule applicable to petitioner's claim of ineffective assistance of trial counsel and Hendrix failed to comply with that rule; the state court enforced the rule by barring her from litigating her ineffective assistance of trial counsel in her postconviction proceeding based on *res judicata*; and *res judicata* is an adequate and independent state ground on which the state can foreclose review of his federal constitutional claims.  Thus, to overcome the procedural bar, Hendrix must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.  Hendrix does not clearly allege cause to excuse her procedural default of Ground Four.  To the extent that Hendrix relies upon her earlier argument that her procedural default should be excused based on ineffective assistance of appellate counsel, as discussed above in reference to Ground One, Hendrix procedurally defaulted her ineffective assistance of appellate counsel claims and therefore such claims may not serve as cause to excuse her procedural default.  Since Hendrix is unable to demonstrate "cause," even if Hendrix could show "prejudice," Ground Four is barred from federal habeas review based on the procedural default.[11]

---

[11] As with Grounds One and Two, Hendrix has not demonstrated that her procedural default of Ground Four should be excused on the basis that she is actually innocent.

Accordingly, the undersigned recommends that the Court find that Ground Four is barred from federal habeas review.

### 5.  Ground Five is not cognizable

In Ground Five, Hendrix asserts:

Habeas corpus should be granted when the defendant's 6th amendment rights have been violated with respect to determination of where the alleged crime occurred.

Doc. 1-1, p. 4.  Hendrix argues that the Respondent incorrectly suggests that, in Ground Five, she is asserting a claim that the indictment is defective.  Doc. 12, p. 7.  She argues that, while her claim is connected to the indictment because the indictment stated that the conduct took place in more than one jurisdiction, her challenge is to the trial court's failure to instruct the jury based on the defense's request for a jury instruction that the jury agree on what, if any, crime or element of what offenses actually occurred in Lake County (the county where the trial occurred).[12]  Doc. 12, pp. 7-8.  Respondent argues that Hendrix's jury instruction claim is not cognizable in federal habeas review because it does not present a constitutional question.[13]  Doc. 10, p. 43.

 "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," *Estelle*, 502 U.S. at 67-68, and a federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law."  *Pulley*, 465 U.S. at 41.  When

---

[12] In her direct appeal, Hendrix argued that the trial court erred in not providing an additional verdict form (as opposed to a jury instruction) requiring the jury to identify what element of any offense it believed Hendrix had committed in Lake County.  Doc. 10-2, pp. 212-214.

[13] Respondent also argues procedural default because, although Hendrix raised an issue regarding the jury instructions and the indictment in her direct appeal, Hendrix did not appeal to the Ohio Supreme Court from the Ohio Court of Appeals' June 25, 2012, decision affirming her conviction and sentence. Doc. 10, pp. 43-44. Hendrix does not contend that she fully exhausted the claim now raised in Ground Five.  She appears to again assert as cause to excuse the alleged procedural default a lack of coordination between various counsel who represented her and that she lacked personal involvement in the initial and subsequent appeal.  Doc. 12, p. 8.  As discussed above, Hendrix has failed to demonstrate or articulate how that lack of coordination between various counsel caused her not to raise certain issues and/or that her lack of personal involvement in her appeal is a sufficient reason to excuse a procedural default.  However, since Hendrix's claim is not cognizable on federal habeas review, the Court need not determine whether the claim is procedurally defaulted and/or unexhausted.

considering a claim of defective jury instructions, the issue is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S at 72.

Hendrix has not shown that the trial court's venue jury instruction was a misstatement of the law.[14]  Nor has she shown that the jury instruction  she requested was constitutionally required or resulted in a fundamentally unfair trial.  As indicated by the Ohio Court of Appeals , "there was sufficient evidence introduced for venue to be established in Lake County under R.C. 2901.12(G)."  Doc. 10-3, p. 97.   Since Hendrix is unable to demonstrate that her claim is other than an issue of state law, Ground Five is not cognizable in federal habeas review.

Further, to the extent that Hendrix attempts to raise a separate issue with respect to venue by asserting that her Sixth Amendment right has been violated with respect to where the alleged crime occurred, matters concerning venue involve matters of state law and therefore any such claim is likewise not cognizable on federal habeas review.[15]  *Baisden v. Tate*, 869 F.2d 1488 (6th Cir. 1989) (unpublished) (finding a federal habeas claim not cognizable because matters concerning venue involve matters of state law) (citing *Pulley*, 465 U.S. at 41); *Hackney v. Lafler*,

---

[14] As indicated by the Ohio Court of Appeals, the trial court provided the following jury instruction on venue:

> It is alleged that any one or more of the offenses charged or any element of one or more of the offenses charged, took place in Lake County, Ohio.  The right of this court to try the Defendant depends upon proof that an offense or element of an offense was committed in this county.  When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any 2 or more counties or jurisdictions, but it cannot be reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any of those counties or jurisdictions.  When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred.

Doc. 10-3, pp. 87-88, ¶ 80.

[15] Additionally, it does not appear that Hendrix presented her claim to the state courts as an alleged violation of her federal Sixth Amendment venue rights.  Doc. 10-2, pp. 206-214 (Assignments of Error Three and Four arguing Fifth and Fourteenth Amendment violations and violations of the Ohio Constitution).  Thus, Hendrix not only failed to file an appeal with the Ohio Supreme Court regarding the claim asserted in Ground Five, she also may not have presented the claim in Ground Five to the state courts in the same manner that she now presents the claim such that a separate procedural default may have occured.

2008 WL 2544869, *8 (E.D. Mich. June 20, 2008) (finding that petitioner's claim that the prosecution had failed to prove that a crime had occurred in two counties was not cognizable because the issue raised a question of state law); s*ee also Jalowiec v. Bradshaw*, 2008 WL 312655, *98 (N.D. Ohio Jan. 31, 2008) (indicating that the Supreme Court has not determined that the Sixth Amendment's venue clause applies to the states).

For the reasons set forth above, the undersigned recommends that the Court find that Ground Five is not cognizable in federal habeas review.

### IV. Conclusion and Recommendation

For the reasons stated herein, the undersigned recommends that the Court **GRANT** Respondent's Motion to Dismiss (Doc. 10) and **DISMISS with prejudice** Hendrix's Petition (Doc. 1).

December 8, 2014

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).