## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ERIN M. HENDRIX,** | ) | **CASE NO.  1:14 CV 1296** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **JEFF LISATH, Warden,** | ) | **Magistrate Judge Kathleen B. Burke** |
| | ) | |
| **Respondent.** | ) | **MEMORANDUM OPINION** |

This matter is before the Court upon the Report and Recommendation of Magistrate Judge Kathleen B. Burke.  (Document #13.)  The Magistrate Judge recommends that the Petition for Writ of Habeas Corpus filed by Petitioner, Erin M. Hendrix, pursuant to 28 U.S.C. § 2254 (Docket #1) be dismissed with prejudice.

### Factual and Procedural History

As set forth by the Magistrate Judge, the factual and procedural history of this case is as follows:

### I. Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb, 540 F. 3d 393, 397 (6th Cir. 2008) cert. denied*, 129 S. Ct. 2878 (2009). The Eleventh District Court of Appeals summarized the facts underlying Hendrix's conviction

as follows:

{¶ 2} H.H., appellant's daughter and the victim in this case, was born on September 24, 2007. At the time of H.H.'s birth, the Hendrix family lived in Bellaire, Belmont County, Ohio, where appellant was employed as a chemistry, physics, and natural sciences teacher at Bellaire High School and Rick was a pastor at a local church.

{¶ 3} Several months after her birth, in November of 2007, H.H. was taken to Pittsburgh Children's Hospital where the family met with pediatrician Dr. Benjamin Bolser. According to the doctor, the Hendrixes had concerns regarding H.H.'s failure to gain weight, issues with her hearing, problems with vomiting, and general failure to thrive. After testing, heath care professionals also discovered H.H. had critically low calcium and blood sugar levels.

{¶ 4} In early 2008, H.H. was diagnosed with CHARGE Syndrome, a congenital disorder that slows physical and mental development. The physical manifestations of CHARGE Syndrome can include clefts in the irises of the eyes; heart defects; blockages of the nasal passages; retardation of growth and development; non-specific genital and urinary problems; and hearing abnormalities.

{¶ 5} On February 28, 2008, appellant brought H.H. in to visit Dr. Bolser due to concerns she had regarding, what she believed were odd movements of H.H.'s head and potential seizures. The doctor observed some abnormal movement in H.H. but considered the child to be otherwise stable. Dr. Bolser nevertheless scheduled an EEG for H.H. on the following day. On the morning of February 29, 2008, however, Dr. Bolser encountered appellant and H.H. outside his office. The doctor noticed that the child was notably fussy and pale. Instead of proceeding with the EEG, he told appellant to take H.H. to the emergency room.

{¶ 6} H.H. went to the emergency room where she was lethargic, had an ashen-blue appearance, and was suffering from profound diarrhea. She was later transferred to the ICU where medical staff inserted a tracheostomy tube to clear the child's airways as well as a gastrostomy tube for feeding. H.H. was also diagnosed with a blood disorder called methemoglobinemia, which, according to Dr. Bolser, caused her bluish appearance. And, upon reviewing H.H.'s X-rays, medical staff observed a "retained contrast material in [H.H's] GI tract." Such a phenomenon usually occurs when a patient consumes barium to highlight an area of the abdomen. According to Dr. Bolser, however, H.H. had not been administered any recent contrast material.

-2-

{¶ 7} Given her persisting symptoms, H.H.'s blood lead levels were tested on March 8, 2008. The test results yielded a dangerously high reading of 135 micrograms per deciliter ("M/D") of blood. According to Dr. Bolser, any reading above ten in a one-year-old child is cause for medical concern; H.H. was five months old at the time of the reading.

{¶ 8} Tests ultimately revealed that the opaque contrast material observed in H.H.'s X-ray was actually a collection of lead flecks that had accumulated in the child's stomach. Doctors were unable to determine specifically how or when the lead was introduced into H.H's body; given the child's age, however, it was clear that the poisonous metal was introduced to her system by another.

{¶ 9} H.H. remained in the hospital until March 26, 2008. During her stay, she was given intravenous EDTA chelation therapy. Chelators, such as EDTA, are medications used in lead and other heavy metal poisoning cases. Chelators bind to the lead in the blood and permit the body to release the poison via urination. After approximately two weeks of treatment, H.H.'s blood lead level reduced dramatically to 36 M/D. H.H. was ultimately sent home with her parents to continue oral chelation therapy using a chelator called Suximer.

{¶ 10} Medical toxicologist Dr. Anthony Pizon treated H.H. from March of 2008, after her initial test revealed the dangerously high blood lead level, through June of 2009. According to Dr. Pizon, lead poisoning commonly occurs in two specific populations, adults who work with or around the poison and toddlers who accidently poison themselves by consuming the substance, e.g., eating lead paint chips. Because H.H. did not fit either profile, the source of her exposure, while exogenous (from an outside source) remained a mystery. To rule out general environmental contamination, both appellant and H.H.'s father were tested for exposure. Their lead levels were zero. Water sources were tested as well as the family home. All tests were negative.

{¶ 11} Dr. Pizon then requested a sample of H.H.'s powdered formula to test it for the presence of lead. Appellant brought a can of the formula to the hospital in March of 2008, but when the doctor sought to retrieve it, it had disappeared and was never recovered. Dr. Pizon then asked if appellant had H.H.'s liquid medications available for testing. According to the doctor, appellant became anxious and her face went red at the suggestion. Stuttering, she admitted she had the medications and gave them to the doctor. Two of the three medications, Pepcid and Robinul, tested positive for lead; the third, a calcium supplement, did not.

-3-

{¶ 12} With respect to the poisoned medications, Dr. Pizon ruled out accidental contamination because they came from separate pharmacies and there had been no reports of other patients suffering from lead poisoning as a result of being treated with either Pepcid or Robinul. Moreover, Dr. Pizon concluded that the amount of lead found in the medications was insufficient to trigger H.H.'s heightened 135 M/D lead reading and therefore contamination had to come from an additional exogenous source or sources.

{¶ 13} After her release in late March of 2008, H.H. returned to the hospital on April 8, 2008 for tests of her blood lead level. H.H.'s test returned a reading of 58 M/D. Although the level had increased from the previous low of 36 M/D, the elevated reading was not a surprise given the nature of a lead poisoning case. Once an individual is exposed, lead remains in the body's tissues and bones. Hence, after the blood is "cleaned" and the poison voided with the assistance of chelation therapy, lead from the bones and tissues invariably leaches back into the blood stream. In any given case, therefore, within three weeks of chelation treatment, a patient will experience a "rebound" in his or her blood lead levels. Given these points, the 58 M/D blood lead level reading represented an expected rebound that was medically consistent with a lead poisoning case.

{¶ 14} Nevertheless, Dr. Pizon noted that the chelation therapy seemed to be acting inconsistently. When H.H. was given IV chelation with EDTA, her blood lead levels fell sharply; when she was sent home with oral Suximer, however, her blood lead levels would, in Dr. Pizon's words, "skyrocket." For example, H.H.'s blood lead levels went from 58 M/D on April 8, 2008, her initial "rebound," to 97.4 M/D on May 8, 2008. While her levels decreased to 60 M/D on June 7, 2008, they rose again to 71 M/D on June 23, 2008. And, between late July and early August of 2008, her blood level readings rose from 74.7 M/D to 84 M/D. By October 3, 2008, the levels decreased to 72 M/D. Dr. Pizon remained confounded by the persistent fluctuations. The inconsistencies and relatively rapid spikes, according to Dr. Pizon, "pharmacologically, medically, just made no sense."

{¶ 15} Dr. Pizon was aware that some chelators may bind lead to tissue and increase absorption of the poison rather than cause it to be released in the urine. In order to be certain the oral Suximer was not triggering such a response, in December of 2008, Dr. Pizon placed H.H. on oral Suximer chelation in the hospital. When nurses administered the treatment, Dr. Pizon observed the levels went down nicely. According to the doctor, such a result was odd, "not because it's not what we expect, but it was strange

-4-

because it's not what was typically happening with [H.H] over the previous treatments."

{¶ 16} While it was clear to Dr. Pizon H.H. had been poisoned by an exogenous source, it was still unclear, in his mind, the specific means by which she was poisoned. Taking all the data into consideration, the doctor concluded that the initial poisoning could not be responsible for the repeated spikes in her blood level. Similarly, Dr. Pizon did not believe the lead flecks found in H.H.'s stomach could explain the erratic spikes in the child's blood lead levels. The doctor underscored, lead in an individual's body, unless it is reintroduced, leaches slowly, not aggressively into the blood. And, even though the re-exposure could still occur in an accidental fashion, the doctor, and other hospital personnel, became more and more concerned that H.H. was suffering from an ongoing malicious poisoning.

{¶ 17} In late June of 2009, the Hendrix family moved from Belmont County, Ohio to Lake County, Ohio because Rick Hendrix was transferred to the Mentor United Methodist Church. The family moved into the parsonage, which, it bears noting, tested negative for lead.

{¶ 18} On July 7, 2009, appellant took H.H. to visit her new pediatrician, Dr. Susan Dykeman. Aware of H.H.'s history, the doctor decided to test the child's blood lead levels, the results of which were 51.2 M/D. Dr. Dykeman considered this reading high and referred the child to pediatric toxicologist Dr. Lawrence Quang at Rainbow Babies and Children's Hospital in Cleveland.

{¶ 19} On July 13, 2009, Dr. Quang met with appellant and H .H. He considered the child's lead level high and her medical history rather suspicious. Like Dr. Pizon, Dr. Quang emphasized that an ordinary case of child lead poisoning occurs between the ages of nine months and four years; when children have the gross motor skills to move about and the fine motor skills to pick up and place things into their mouths. As H.H. was never developmentally advanced enough to move or independently put anything in her mouth, she was not within the typical population of children who suffer from accidental lead poisoning. Furthermore, H.H.'s lead levels regularly went beyond what Dr. Quang opined was the initial rebound level after chelation was administered. Dr. Quang consequently observed that, unless poison was reintroduced, her case defied the more than seven decades of medical research in this area.

{¶ 20} Given these points, Dr. Quang initiated another blood lead level test which returned a blood lead level of 67.8 M/D, over 16 points higher than the test results received only a week earlier. Dr. Quang admitted H.H. to the hospital and, because the hospital did not have IV EDTA available, he sought permission from appellant to treat the child with Suximer

chelation. Appellant refused permission, asserting Suximer had been previously used but was ineffective. The doctor offered a third option, a more toxic chelator called D-penicillamine. According to Dr. Quang, H.H. stood a 30 percent chance of an adverse reaction being treated with D-penicillamine, as opposed to a two to three percent chance using Suximer. Because, however, appellant was entitled to refuse treatment, the doctor was obligated to respect the decision. Fortunately, Dpenicillamine worked and, by late July of 2009, H.H.'s blood lead level decreased into the mid–40s, where it remained for the next several months.

{¶ 21} On July 24, 2009, after considering H.H.'s case and speaking with his medical team, Dr. Quang, concluded appellant was involved in the introduction of lead into the child's system. He therefore contacted the department of job and family services and, given the circumstances of the case, the Mentor Police Department was notified. The department immediately launched an investigation. And, after speaking with social workers from the Lake County Department of Job and Family Services, officers obtained a search warrant for the Hendrix's home.

{¶ 22} On July 25, 2009, Mentor Police executed the warrant and, while searching a first floor spare bedroom, officers found a back pack in a closet. Inside the backpack was a double-bagged sandwich baggie containing white powder. Appellant acknowledged that she used the backpack for teaching; she denied, however, any knowledge of the contents of the baggie. When she reached for the baggie, the on-scene detective handling the evidence moved it from her reach. According to Detective Colleen Petro of the Mentor Police Department, appellant's cheeks flushed bright red and her eyes welled with tears. After being tested, the powder in the baggie was identified as lead nitrate, a colorless, near-tasteless, water soluble form of lead. On July 27, 2009, emergency custody of H.H. was granted to the Lake County Department of Job and Family Services.

{¶ 23} During the investigation, officers were able to confiscate two bottles of lead nitrate from the school where appellant formerly worked in Belmont County, a newer bottle and an older bottle. The bottles and the lead found in the baggie were sent to the Center for Disease Control for lead isotope ratio comparisons. After analysis, the samples could neither be identified nor excluded as the sources of lead in H.H.'s body. Although these tests were inconclusive, former Bellaire High School Principal Mike Sherwood was able to confirm that appellant submitted a requisition form for lead nitrate on August 1, 2007 that was filled in September of 2007; and, on October 14, 2008, she submitted a second requisition form for lead nitrate that was filled on December 31, 2008. As only one newer bottle of lead nitrate was recovered from the school, the other recently purchased

-6-

bottle was unaccounted for and never recovered.

{¶ 24} Meanwhile, Dr. Quang was still concerned about the lead flecks resting in H.H.'s stomach mucosa. He considered surgery, but after consulting with pediatric surgeons, he concluded the risks of irreversible internal damage were too great. After further investigation, Dr. Quang found research indicating that a class of drugs called biophosphonates, generally used to combat the effects of osteoporosis in menopausal women, had a tendency to remove lead in the human body which is released into the bloodstream as bones age and breakdown. Although biophosphonates are not FDA approved for children, the doctor thought he could carefully monitor the effects of the medication on H.H. and, if they work, avoid the surgical option. After receiving approval from the pediatric clinical research review committee at the hospital, H.H. was placed on a biophosphonate called Pamidronate. During her treatment, H.H.'s blood lead level dropped from 45 M/D to 35 M/D then, finally to 25 M/D where it remained in equilibrium.

{¶ 25} Not only was the Pamidronate therapy effective in further stabilizing H.H.'s blood lead level, it allowed Dr. Quang to conclude that the main contributor of her endogenous (internal) exposure was lead being released from the bone. From this, the doctor further posited that the lead flecks found in H.H.'s stomach were of negligible significance, essentially negating the need for surgery. That is, to the extent Pamidromate specifically addressed lead levels released from the bone and H.H.'s blood lead levels precipitously decreased on the medication, the extant lead flecks in her stomach contributed, at most, slightly to the profound lead intoxication from which H.H. had been suffering.

{¶ 26} After thoroughly reviewing H.H.'s medical charts and the data from H.H.'s treatment history, Dr. Quang opined that lead was exogenously reintroduced into H.H.'s system on nine different occasions between February of 2008 and July of 2009. Dr. Pizon concluded H.H. was re-poisoned on ten separate occasions. And, in hindsight, Dr. Pizon noted that H.H.'s symptoms upon admission to the hospital in February of 2008 were consistent with acute lead nitrate poisoning. Chemically, lead nitrate poisoning causes, inter alia, lethargy and explosive diarrhea, and, perhaps most significantly, the nitrate component of the lead salt causes methemoglobinemia, resulting in a cyanotic or bluish appearance.

{¶ 27} Both toxicologists agreed that had H.H. not been treated aggressively after her lead levels tested at 135 M/D, she would have died. And, according to Dr. Quang, any lead exposure to a child in the first two years of life will cause permanent, irreversible damage to the brain. Such exposure impairs the movement and reception of neurotransmitters,

chemicals that, in essence, facilitate brain function. Dr. Quang also pointed out that lead poisoning in a child causes cellular apoptosis, a condition describing cell death. Exposure, therefore, impairs a child's ability to learn, causes significant behavioral difficulties, and, in fact, causes sub-normal intelligence. In H.H.'s case, Dr. Quang opined, the initial exposure caused the child to lose between 27 and 40.5 IQ points.

{¶ 28} Dr. Quang further noted that lead exposure is deleterious to kidney function, causing kidney disease, hypertension and, predisposes an individual to strokes and heart attacks later in life. Finally, the doctor pointed out lead in the bone has a half life of 20 to 30 years and thus, while it can be managed, will continue to leach into the blood stream over the course of a patient's lifetime. These points, according to Dr. Quang, will undermine H.H.'s ability to reach her full potential, particularly if her full potential was already compromised by potentially severe pre-existing developmental delays due to the CHARGE Syndrome diagnosis.

*State v. Hendrix*, 2012 WL 2369411, *1-6 (Ohio App. 11 Dist., June 25, 2012); Doc. 10-3, pp. 62-107.

## II. Procedural Background

### A.     State Conviction

#### 1.     Indictment and Plea

In September 29, 2010, the Lake County Grand Jury indicted Hendrix on twenty-two counts. Doc. 10-2, pp. 1-11. Hendrix was indicted on six counts of contaminating a substance for human consumption of use (Counts One – Six); one count of attempted aggravated murder (Count Seven); one count of attempted murder (Count Eight); one count of felonious assault (Count Nine); two counts of endangering children (Counts Ten and Eleven); two counts of complicity to attempted murder (Counts Twelve and Thirteen); one count of complicity to felonious assault (Count Fourteen); two counts of complicity to endangering children (Counts Fifteen and Sixteen); and six counts of complicity to contaminating a substance for human consumption or use (Counts Seventeen – Twenty-two). Doc. 10-2, pp. 1-11.

On September 30, 2010, Hendrix, represented by counsel, entered a plea of not guilty to the charges in the indictment. Doc. 10-2, pp. 12-13. On November 17, 2010, the State filed a Motion for Leave to Amend the Indictment as to Counts One – Six (Doc. 10-2, pp. 14-25) to include "an allegation that the alleged mingling of a poison, hazardous chemical, or harmful substance was committed 'when Erin Hendrix knew or had reason to know, that the food, drink, non-prescription drug, prescription drug, or pharmaceutical product may be

ingested or used by another person.'" (Doc. 10-2, pp. 131-132). On November 24,
2010, the trial court granted the State's Motion to Amend the Indictment. Doc.
10-2, pp. 26-29. Thereafter, on December 3, 2010, Hendrix filed a response to the
State's Motion to Amend the Indictment, arguing that she required a copy of the
Grand Jury testimony to insure that the grand jurors were aware of the applicable
law regarding O.R.C. § 2927.24 and considered evidence regarding the elements
that the state wanted added to the indictment. Doc. 10-2, pp. 132. Following a
January 26, 2011, oral hearing on pending motions, on February 2, 2011, the trial
court let stand its prior ruling granting the State's November 17, 2010, Motion to
Amend. Doc. 10-2, pp. 132.

## 2.      Pre-trial motions

*Motions to Suppress*

On December 17, 2010, Hendrix filed a Motion to Suppress evidence
found during the July 25, 2009, search of her residence and during a subsequent
search of computer related equipment that took place on or about August 7, 2009.
Doc. 10-2, pp. 30-63. On January 6, 2011, the State filed its response to Hendrix's
Motion to Suppress. Doc. 10-2, pp. 64-68. On January 7, 2011, Hendrix filed a
Supplemental Motion to Suppress Statements Made During Search of Home.
Doc. 10-2, pp. 69-72. On January 20, 2011, the State filed its response to
Hendrix's Supplemental Motion to Suppress. Doc. 10-2, pp. 73-79. A hearing was
conducted regarding Hendrix's motions to suppress on January 27, 2011, (Doc.
10-2, p. 80), and on January 28, 2011, the trial court denied Hendrix's motions to
suppress (Doc. 10-2, pp. 80-87).

*Motion for Access to Grand Jury Records, Renewed Motion for Bill of
Particulars, and Motion to Dismiss Indictment*

On December 17, 2010, Hendrix filed a Motion for Access to Grand Jury
Records, Renewed Motion for Bill of Particulars, or, Alternatively, Motion to
Dismiss Indictment.1 Doc. 10-2, pp. 88-105. On January 3, 2011, the State filed
its response. Doc. 10-2, pp. 106-110.  Following a January 26, 2011, oral hearing
on pending motions, on February 2, 2011, the trial court denied Hendrix's request
for access to grand jury records which was premised on perceived flaws in the
State's indictment. Doc. 10-2, pp. 133-135. The trial court found Hendrix's
renewed request for a bill of particulars well-taken based on the State's agreement
to provide a bill and Hendrix's acknowledgement of having received it before the
January 26, 2011, hearing. Doc. 10-2, p. 133.

*Motions in Limine and Motions regarding taking testimony*

On January 7, 2011, Hendrix filed four motions in limine: (1) a motion in
limine to exclude testimony regarding mental health issues; (2) a motion in limine

to exclude evidence of falsification of college transcript; (3) a motion in limine to exclude evidence of lead nitrate; and (4) a motion in limine to exclude testimony of past sexual abuse. Doc. 10-2, pp. 111-116, 117-121, 122-125, 126-130, 131. The State filed two evidentiary motions: (1) January 25, 2011, motion for taking a video deposition; and (2) January 26, 2011, oral motion to take testimony of David Green out of order. Doc. 10-2, p. 131.

Following the January 26, 2011, oral hearing, on February 2, 2011, the trial court granted Hendrix's motion in limine to exclude testimony regarding mental health issues and also granted the State's motion for taking video deposition and motion to take testimony of David Green out of order. Doc. 10-2, p. 131. The trial court held in abeyance, pending an evidentiary hearing at trial, Hendrix's motions in limine to exclude evidence of falsification of college transcript and to exclude evidence of past sexual abuse. Doc. 10-2, p. 132. The trial court made no ruling regarding Hendrix's motion in limine to exclude evidence of lead nitrate noting that that motion related to motions to compel testimony from scientists located at the Center for Disease Control and Prevention in Georgia which had not been filed as of the time of the hearing. Doc. 10-2, pp. 132-133.

### 3.  Trial and sentencing

Following a jury trial, on February 28, 2011, the jury found Hendrix guilty of felonious assault (Count Nine), both counts of endangering children (Counts Ten and Eleven), and eleven counts of complicity (Counts Twelve – Twenty-Two). Doc. 10-2, pp. 164-165. The jury found Hendrix not guilty of the first eight counts. Doc. 10-2, pp. 165-166.

On March 15, 2011, the trial court conducted a sentencing hearing and, on March 21, 2011, issued its Judgment Entry of Sentence. Doc. 10-2, pp. 167-171. The trial court merged Counts Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Nineteen, Twenty, Twenty-One, and Twenty-Two with Count Eighteen (complicity to contaminating a substance for human consumption or use) for purposes of sentencing and sentenced Hendrix to a term of life imprisonment with parole eligibility after serving fifteen years in prison. Doc. 10-2, p. 169.

### B.  Direct appeal

On April 11, 2011, Hendrix, represented by counsel, filed a Notice of Appeal with the Eleventh District Court of Appeals. Doc. 10-2, pp. 172-178. On October 24, 2011, Hendrix filed her appellate brief asserting the following assignments of error:

>    1.  The trial court erred to the prejudice of the defendant-appellant when it overruled her motion to dismiss the defective indictment in

violation of her right to indictment under the Ohio Constitution and Due Process under the United States and Ohio Constitutions.

First Issue Presented for Review and Argument: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where its counts were duplicitous.

Second Issue Presented for Review and Argument: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where it contained overlapping, "carbon-copy" counts.

Third Issue Presented for Review and Argument: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where its counts were multiplicitous.

Fourth Issue Presented for Review and Argument: The indictment failed to ensure to the defendant-appellant her constitutional rights of grand jury presentment, proper notice, and due process where its counts lacked essential elements of the crimes charged and misstated the requisite mens rea.

2. The trial court erred to the prejudice of the defendant-appellant when it overruled her motion to dismiss the charges of attempted felony-murder and complicity to attempted felony-murder in violation of her right to Due Process as guaranteed by the United States and Ohio Constitutions.

Issue Presented for Review and Argument: The counts in the indictment alleging attempted felony murder and complicity to attempted felony murder failed to state an offense and should have been dismissed.

3. The defendant-appellant's constitutional rights to indictment, trial in the county where the offense is alleged to have been committed and due process were violated when the trial court gave an inappropriate venue instruction over defense objection in contravention of the Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

Issue Presented for Review and Argument: When the defendant-appellant was indicted as having committed a course of

-11-

criminal conduct with at least one of the offenses or any element of one of the offenses occurring in Lake County, the trial court erred when it gave a venue instruction per R.C. 2901.12(G) that told the jury the defendant-appellant could be tried in Lake County even if the jury could not determine that she had committed an offense or element of an offense in Lake County.

4.  The trial court erred when it denied the defendant-appellant's request for a verdict form addressing venue in violation of her rights to due process and fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United State[s] Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

    Issue Presented for Review and Argument: The trial court committed reversible error when it rejected the defendant-appellant's Proposed Additional Verdict Form which asked the jury to specify, for each guilty verdict, what elements, if any, it found she had committed in Lake County.

5.  The defendant-appellant was deprived of her constitutional rights to fair trial and due process when the trial court admitted irrelevant and misleading testimony regarding an alleged prior bad act and her character as a high school chemistry teacher.

    Issue Presented for Review and Argument: The trial court committed reversible error when it permitted the State to elicit irrelevant and misleading testimony regarding the defendant-appellant's alleged unsafe behavior regarding a mercury spill in her high school classroom.

6.  The trial court erred to the prejudice of the defendant-appellant when it denied her motion for acquittal made pursuant to Crim. R. 29(A).

    Issue Presented for Review and Argument: The trial court erred in denying the defendant-appellant's Crim. R. 29 Motion for Acquittal where the State failed to provide sufficient evidence to establish beyond a reasonable doubt that any of the offenses or any element of the offenses occurred in Lake county, that the defendant-appellant was either the principle [sic] offender or complicit in the offenses and/or that the poison in the medication involved in specific counts caused serious physical harm or was sufficient to cause death.

7.  The trial court erred to the prejudice of the defendant-appellant

-12-

when it returned a verdict of guilty against the manifest weight of
the evidence.

Issue Presented for Review and Argument: The conviction of the
defendant-appellant is not supported by competent, credible
evidence which proves her guilt beyond a reasonable doubt.

Doc. 10-2, pp. 179-230. The State filed its appellate brief on January 4, 2012.
Doc. 10-3, pp. 1-53. On June 25, 2012, the Eleventh District Court of Appeals
affirmed the judgment of the trial court. Doc. 10-3, pp. 62-107; see also *State v.
Hendrix*, 2012 WL 2369411 (Ohio App. 11 Dist., June 25, 2012). Hendrix did not
appeal the decision to the Ohio Supreme Court.

## C.      Petition to Vacate and Set Aside Judgment

While her appeal to the Eleventh District Court of Appeals was pending,
on January 13, 2012, Hendrix, represented by counsel, filed a Petition to Vacate
and Set Aside Judgment under R.C. 2953.21. Doc. 10-3, pp. 108-216. In her
Petition to Vacate and Set Aside Judgment, Hendrix asserted eight grounds for
relief which are summarized below:

Ground One: Erin Hendrix's convictions and sentences are void and/or
voidable because she was denied the effective assistance of counsel at her
trial to which she was entitled under the Sixth and Fourteenth
Amendments. Mrs. Hendrix's counsel failed to employ an expert to
review the CDC's report.

Ground Two: Erin Hendrix's convictions and sentences are void and/or
voidable because she was denied the effective assistance of counsel at her
trial to which she was entitled under the Sixth and Fourteenth
Amendments. Mrs. Hendrix's counsel failed to employ a competent expert
to refute Dr. Quang's testimony that the CDC's report scientifically
concluded that H.H. was poisoned by more than one lead product, and that
the poisoning was accomplished with a mixture of the three lead samples
that were seized from Ms. Hendrix's classroom and possession.

Ground Three: Erin Hendrix's convictions and sentences are void and/or
voidable because she was denied the effective assistance of counsel at her
trial to which she was entitled under the Sixth and Fourteenth
Amendments. Mrs. Hendrix's counsel failed to request a continuance in
order to consult with a competent expert after hearing Dr. Quang's
testimony that the CDC's report scientifically concluded that H.H. was
poisoned by more than one lead product, and that the poisoning was
accomplished with a mixture of the three lead samples that were seized
from Ms. Hendrix's classroom and possession.

-13-

Ground Four: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments. Mrs. Hendrix's counsel failed to object to the three lead-nitrate samples as being more prejudicial than probative, and that the samples should have been excluded.

Ground Five: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments. Mrs. Hendrix's counsel failed to object to Dr. Quang's interpretations regarding the CDC's report. Because Dr. Quang did not conduct the analysis, and the CDC analysts were only testifying as fact witnesses, Dr. Quang's testimony regarding his conclusions as to the CDC's report violated Erin Hendrix's rights under the Confrontation Clause of the United States Constitution.

Ground Six: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied due process when the State failed to comply with Crim. R. 16(K) regarding Dr. Quang's testimony relating to his erroneous interpretation of the CDC's report.

Ground Seven: Erin Hendrix's convictions and sentences are void and/or voidable because she was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments. Mrs. Hendrix's counsel failed to object when Dr. Quang began to testify outside the realm of both his expertise and the discovery report.

Ground Eight: The State's misconduct for exceeding the boundaries as set forth in Evid. R. 702 denied Mrs. Hendrix the right to a fair trial and due process of law.

Doc. 10-3, pp. 125-145. On March 16, 2012, the State filed its Response to Hendrix's Petition to Vacate and Set Aside Judgment. Doc. 1-4, pp. 1-105. Hendrix filed a Reply. Doc. 10-4, pp. 111-121. On June 29, 2012, the trial court denied Hendrix's Petition to Vacate and Set Aside Judgment without an oral hearing. Doc. 10-4, pp. 122-134.

Hendrix, represented by counsel, filed an appeal from the trial court's June 29, 2012, order denying her Petition to Vacate and Set Aside Judgment. Doc. 10-4, pp. 135-215. In her brief, she raised the following assignment of error:

The trial court erred in dismissing Mrs. Hendrix's petition without an evidentiary hearing because Mrs. Hendrix provided sufficient evidence

-14-

that she was denied the effective assistance of counsel and that the State failed to conduct Mrs. Hendrix's trial in accordance with Ohio rules of evidence.

Doc. 10-4, p. 142. In support of her assignment of error, she argued:

I.     A defendant is denied the effective assistance of counsel if counsel fails to ensure that a qualified expert, whose testimony would exonerate the defendant, is available to testify.

II.    A prosecutor's misconduct denies a defendant due process as guaranteed by the Fourteenth Amendment of the United States Constitution and Section 16, Article I of the Ohio Constitution.

III.   An evidentiary hearing is warranted in postconviction proceedings when the petitioner alleges sufficient operative facts to state a claim for the ineffective assistance of counsel.

IV.    The unwarranted dismissal of a postconviction petition without a hearing is a denial of due process.

Doc. 10-4, pp. 143-154. On September 27, 2012, the State filed its brief. Doc. 10-4, pp. 216-247. On February 25, 2013, the Eleventh District Court of Appeals affirmed the judgment of the trial court. Doc. 10-4, pp. 250-261.

On April 10, 2013, Hendrix, represented by counsel, filed a Notice of Appeal from the Eleventh District Court of Appeals' February 25, 2013, judgment to the Ohio Supreme Court and a Memorandum in Support of Jurisdiction. Doc. 10-5, pp. 248-283. In her Memorandum in Support of Jurisdiction, Hendrix asserted four propositions of law which are summarized below:

I.     A defendant is denied the effective assistance of counsel when counsel fails to consult with or present a competent, credible expert whose testimony would have had a reasonable probability of changing the outcome of the trial.

II.    When the preparer of a report refuses to make a scientific conclusion based on the report, a defendant is denied the effective assistance of counsel and her right to confrontation when counsel fails to object to an unqualified "expert" who did not prepare the report yet testified to his own scientific conclusions.

III.   A defendant is denied due process when the State fails to comply with Crim. R. 16(K) and provide, prior to trial, an accurate statement regarding an expert witness's testimony.

-15-

IV.     In postconviction proceedings, an evidentiary hearing must be afforded to a defendant who alleges sufficient operative facts from outside of the record to state a claim for the ineffective assistance of counsel.

Doc. 10-5, pp. 259-268. On May 7, 2013, the State filed a Memorandum in Response. Doc. 10-5, pp. 284-299. On June 26, 2013, the Ohio Supreme Court declined "to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4)." Doc. 10-5, p. 300.

**D.      Application for Reopening Pursuant to App. R. 26(B)**

On September 18, 2012, Hendrix, with counsel, filed an Application to Reopen her direct appeal. Doc. 10-5, pp. 1-226. In her Application to Reopen, Hendrix argued that appellate counsel was ineffective in failing to raise the following issues on appeal:

1.      Erin Hendrix was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments. Mrs. Hendrix's counsel failed to object to Dr. Quang's interpretations regarding the CDC's report. Because Dr. Quang did not conduct the analysis, and the CDC analysts were only testifying as fact witnesses, Dr. Quang's testimony regarding his conclusions as to the CDC's report violated Erin Hendrix's rights under the Confrontation Clause of the United States Constitution.

2.      Erin Hendrix was denied the effective assistance of counsel at her trial to which she was entitled under the Sixth and Fourteenth Amendments. Mrs. Hendrix's counsel failed to object to the State's failure to qualify Dr. Quang as an expert in organic chemistry.

Doc. 10-5, pp. 6-10.

On October 12, 2012, the State filed its Response. Doc. 10-5, pp. 227-236. On December 5, 2012, the Eleventh District Court of Appeals denied Hendrix's Application to Reopen her appeal concluding that appellate counsel was not ineffective for failing to raise the foregoing issues as assignments of error. Doc. 10-5, pp. 237-247. Hendrix did not appeal the decision to the Ohio Supreme Court.

**E.      Federal Habeas Corpus**

On June 16, 2014, Hendrix filed her Petition asserting the following five grounds for relief:

-16-

**Ground One**: Habeas corpus should be granted when appellant received ineffective counsel during trial. Counsel did not present sufficient evidence related to the serious genetic disorder – CHARGE Syndrome – a birth defect suffered by the victim and the impact that condition had on her development. He did not object to the testimony presented by the prosecution that the developmental delays of the child were caused by the lead poisoning, to the prejudice of the appellant.

Supporting Facts: The victim was diagnosed with CHARGE syndrome very early in her life. She has many of the symptoms indicated in the chart. The impact of this diagnosis and the resultant issues in dealing with daily care, let alone treatment of lead poisoning, are extremely complex and present significant challenges to the doctors that treat the victim. It was speculated in the course of her treatment that the development delays in the child contributed to the irregular changes in the lead readings when the child's blood was tested. The Pittsburgh Childrens Hospital felt that for all of their experience with the child and the parents (16 months) that the evidence of recurring exogenous lead poisoning was inconclusive, the original lead poisoning was unexplained and, though the blood readings were abnormal, there was insufficient evidence to remove the child from the parents care.

One week of treatment by Dr. Quang changed all of that when the family moved to Cleveland. However, during the discovery phase of the medical records during pre-trial preparation, a letter prepared by Dr. Quang indicated that he felt the treatment of the patient was "singularly unique" due to CHARGE Syndrome. In fact, in his medical records on the case, Dr. Quang indicated that he felt that the case was singularly unique because of the developmental issues and the lead poisoning taken together.

Counsel did little to bring this genetic condition into his cross examination of expert medical witnesses and did not present witnesses during the defense presentation to adequately explain CHARGE Syndrome and the implications that it presented in the treatment of the child. The jury could not be expected to understand the deleterious effect that CHARGE syndrome presented in the course of treatment of the child and no geneticists were sought as witnesses to assist the defense counsel in making these issues clear.

**Ground Two**: Habeas corpus should be granted when a defendant is denied her right to due process when unfounded characterizations of the victim are offered which result in substantial and injurious effect or influence in determining the jury's verdict.

-17-

Supporting Facts: The trial court erred in allowing the victim to be characterized as mentally retarded. While scientific evidence may indicate that lead poisoning could have a deleterious affect on brain function in a general sense, no cognitive testing was ever conducted for the victim. The child has a genetic disorder that results in a delay of physical development, but never was it determined by testing that she was or is cognitively impaired as a result of the lead poisoning.

In direct testimony by Dr. Quang, a toxicologist, he stated that the child is "mentally retarded" and that she suffered a decline in her IQ of as much as 75 points. A similar statement was used by the prosecution in their closing arguments. In fact, the child demonstrated mental acuity in being able to learn sign language, taught by her mother, which allowed her to effectively communicate as much as any child of two years old can communicate.

The suggestion that the victim was mentally retarded was false and unfounded since no testing was ever done. It was meant to portray the accused in the worst light and prejudiced the jury against Mrs. Hendrix.

**Ground Three**: Habeas corpus should be granted when a defendant is denied due process because the State fails to comply with the court's rules related to providing opposing counsel, prior to the trial, an accurate statement regarding matters to which a witness will testify and their expertise with respect to the testimony expected to be given.

Supporting Facts: Dr. Quang is a medical doctor and a board certified toxicologist. It was disclosed that he would testify as to the diagnosis and treatment of the victim. The defense was notified in the discovery provided by the State that he would be testifying regarding these aspects of his training and knowledge as it related to the case. At no point did the letter addressing his qualifications indicate that he was going to testify as a supplemental expert to the CDC's experts. Defense counsel had no notice that he would offer testimony to interpret the CDC report. The scientifically inaccurate testimony, together with defense counsel's failure to object, directly led to the appellant's conviction.

**Ground Four**: Habeas corpus should be granted when counsel fails to object to an unqualified "expert" who did not prepare the report in evidence, yet testified to its scientific conclusions. The preparer of the analysis did not reach a definitive conclusion that the evidence presented to the court was the same evidence that poisoned the victim.

Supporting Facts: The CDC prepared a report summarizing its testing of the evidentiary material found in the appellant's home and the two lead

-18-

sources obtained from the high school where the appellant was a physics
and chemistry teacher. The report on the scientific testing of the material
explained that the CDC was unable to make any scientific conclusions as
to the source of the lead in the victim's body and found that the lead
evidence did not match the lead in the victim's blood and urine samples
tested. The report stated that the lead provided by the State was clearly
different for two of the items tested and very different for the third
material from the lead in the blood and urine samples of the victim that
were tested. The qualified witnesses – two doctors from CDC – found the
testing inconclusive with respect to it being the source of the lead that
poisoned the victim.

Prosecution witness, Dr. Quang, who did not conduct the analysis of the
properties of the tested material, but only reviewed the CDC report,
overstated his conclusions that the lead in evidence and the lead in the
victim's body were the same. Counsel did not object to Quang's testimony
regarding the source of the lead.

**Ground Five**: Habeas corpus should be granted when the defendant's 6th
amendment rights have been violated with respect to determination of
where the alleged crime occurred.

Supporting Facts: The family moved to Cleveland in June, 2009. On July
14, 2009, the victim was admitted to the Rainbow Babies & Children's
Hospital in Cleveland with an elevated lead level in her blood. The
toxicologist, Dr. Quang, within nine days, checked the home for lead and
treated the child, who had previously been treated at the Pittsburgh
Children's Hospital for 16 months.

On July 23rd, Quang contacted Ohio Child Protective Services and
arranged for emergency custody of the child. The family home was
searched two days later by police, including all of the medical waste that
had accumulated since the move. The medical waste included feeding
tubes and cleaning materials and none of these items were found to have
any trace elements of lead on them.

The Direct Appeal questioned the ruling of the court to a defense counsel
objection that the judge's instructions to the jury were inconsistent with
the indictment. The indictment by Lake County grand jury stated that the
defendant had committed a course of criminal conduct with at least one of
the offenses or any element of one of the offenses occurring in Lake
County. The jury instruction included this sentence: "When it appears
beyond a reasonable doubt that an offense or any element of an offense
was committed in any of two or more counties or jurisdictions, but it
cannot reasonably be determined in which jurisdiction the offense or

element was committed, the offender may be tried in any of those counties or jurisdictions.

Doc. 1, Doc. 1-1.

## Report and Recommendation

On December 8, 2014, the Magistrate Judge issued his Report and Recommendation. (Docket #13.)  Based upon a thorough review of the proceedings in this case, the Magistrate Judge recommends that the Petition be dismissed with prejudice.  No objections have been filed.

## Standard of Review for a Magistrate Judge's Report and Recommendation

The applicable standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to that report.  When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case de novo. FED. R. CIV. P. 72(b) states:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

The text of Rule 72(b) addresses only the review of reports to which objections have been made; it does not indicate the appropriate standard of review for those reports to which no objections have been properly made.  The Advisory Committee on Civil Rules commented on a district court's review of *unopposed* reports by magistrate judges.  In regard to subsection (b) of Rule 72, the advisory committee stated:  "When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  FED. R. CIV. P. 72 advisory committee's notes (citation omitted).

The U.S. Supreme Court stated in *Thomas v. Arn*, 474 U.S. 140, 150 (1985):  "It does not appear that Congress intended to require district court review of a magistrate judge's factual or

-20-

legal conclusions, under a de novo or any other standard, when neither party objects to those findings."

## Conclusion

This Court has reviewed the Magistrate Judge's Report and Recommendation and, after careful evaluation of the record, this Court adopts the findings of fact and conclusions of law of the Magistrate Judge as its own.  The Report and Recommendation (Docket #13) is ADOPTED.

The Petition for Writ of Habeas Corpus filed by Erin M. Hendrix pursuant to 28 U.S.C. § 2254 (Docket #1) is hereby DISMISSED WITH PREJUDICE.  This case is hereby TERMINATED.

## Certificate of Appealability

Pursuant to 28 U.S.C. § 2253, the Court must determine whether to grant a certificate of appealability as to any of the claims presented in the Petition.  28 U.S.C. § 2253 provides, in part, as follows:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In order to make "substantial showing" of the denial of a constitutional right, as required under 28 U.S.C. § 2255(c)(2), a habeas prisoner must demonstrate "that reasonable jurists could

-21-

debate whether . . . the petition should have been resolved in a different manner or that the issue presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983).)

Where a district court has rejected the constitutional claims on the merits, the petitioner must demonstrate only that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484. Where the petition has been denied on a procedural ground without reaching the underlying constitutional claims, the court must find that the petitioner has demonstrated that reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right *and* that reasonable jurists could debate whether the district court was correct in its procedural ruling. *Id.* "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

For the reasons stated in the Magistrate Judge's Report and Recommendation, a reasonable jurist could not conclude that dismissal of the Petition is in error or that Petitioner should be permitted to proceed further. Accordingly, the Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

         s/Donald C. Nugent
         DONALD C. NUGENT
         United States District Judge

DATED:  January 30, 2015

-22-